# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE VAXART, INC. STOCKHOLDER LITIGATION | ) ) | CONSOLIDATED C.A. No. 2020-0767-PAF |

## MEMORANDUM OPINION

Date Submitted: February 4, 2022
Date Decided: June 3, 2022

Stephen E. Jenkins, F. Troupe Mickler, IV, ASHBY & GEDDES, P.A., Wilmington, Delaware; Gregory V. Varallo, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Jeroen van Kwawegen, Daniel E. Meyer, Margaret Sanborn-Lowing, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Gustavo F. Bruckner, Samuel J. Adams, Daryoush Behbood, POMERANTZ LLP, New York, New York; Sascha N. Rand, Rollo C. Baker, IV, Silpa Maruri, Jesse Bernstein, Charles H. Sangree, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; Stanley D. Bernstein, Matthew Guarnero, BERNSTEIN LIEBHARD LLP, New York, New York; William J. Fields, Christopher J. Kupka, Samir Shukurov, FIELDS KUPKA & SHUKUROV LLP, New York, New York; *Attorneys for Plaintiffs*.

Brock E. Czeschin, Andrew L. Milam, RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware; Riccardo DeBari, Renee Zaytsev, THOMPSON HINE, New York, New York; *Attorneys for Defendants Andrei Fioroiu, Wouter W. Latour, Todd Davis, Michael J. Finney, Robert A. Yedid, Anne M. VanLent, and Nominal Defendant Vaxart, Inc.*

Matthew F. Davis, Abraham C. Schneider, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Douglas A. Rappaport, Kaitlin D. Shapiro, Elizabeth C. Rosen, Madeleine R. Freeman, AKIN GUMP STRAUSS HAUER & FELD LLP, New York, New York; *Attorneys for Defendants Steven Boyd, Keith Maher, and Armistice Capital, LLC.*

**FIORAVANTI, Vice Chancellor**

In May 2020, as the COVID-19 pandemic gripped the world, the federal government formed Operation Warp Speed ("OWS") a national program to accelerate the development, manufacturing, and distribution of COVID-19 vaccines, therapeutics, and diagnostics. With nearly $10 billion in authorized funds, the objective was to develop and deliver a safe and effective COVID-19 vaccine by January 2021. As of May 2020, OWS had selected 14 vaccine candidates, which would then be narrowed to the seven or eight most promising candidates. Those finalists would then go through further testing and clinical trials, followed by large scale production and distribution. Shortly after the OWS statement, news reports revealed the names of some, but not all of the selected vaccine candidates.

On June 26, 2020, Vaxart, Inc. ("Vaxart" or the "Company"), a small biotechnology company working to develop an oral COVID-19 vaccine, issued a press release headlined: "Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed." This headline was just that—a headline. It did not tell the whole story. The press release did not state that Vaxart had been selected as one of the seven or eight final vaccine candidates to receive federal funding to develop, manufacture, and potentially distribute its COVID-19 vaccine. Instead, the body of the press release stated that Vaxart had been invited to participate in a non-human, primate, research study funded under the umbrella of resources and initiatives encompassed by OWS.

The plaintiffs are Vaxart stockholders who have alleged that the Company's selection to participate in the non-human primate study should have been disclosed to stockholders in advance of the June 8, 2020 annual meeting of Vaxart stockholders. Specifically, the plaintiffs allege that Vaxart's selection to participate in the research study was material information that stockholders should have been told prior to their vote at the annual meeting on an amendment to Vaxart's equity incentive plan. The plaintiffs also allege that the director defendants were unjustly enriched by hiding this news because the plan amendment, once approved, enabled the directors to issue themselves "spring-loaded" stock options.

In an earlier opinion, the court dismissed breach of fiduciary duty and aiding and abetting claims concerning the board's amendment of two warrant agreements with a hedge fund that enabled the fund to dispose of its shares more quickly. In this opinion, the court considers the remaining breach of fiduciary duty claim concerning the amendment to the equity incentive plan and the unjust enrichment claim concerning compensation decisions made before and after stockholders approved the plan amendment. The operative complaint fails to allege facts creating a reasonable inference that the Company's selection to participate in a single, non-human, primate, research study was material to stockholders voting on the plan amendment. The plaintiffs' unjust enrichment theory also proceeds from the incorrect premise that the selection of Vaxart to participate in a single research study

2

was material non-public information that the directors knew at the time of their compensation decisions and would cause the Company's stock price to increase, thus enhancing the value of their options. Accordingly, the defendants' motion to dismiss is granted.

## I. FACTUAL BACKGROUND[1]

Unless otherwise specified, the facts recited in this Memorandum Opinion are drawn from the Verified Complaint (the "Complaint"), documents integral thereto, or otherwise subject to judicial notice.[2]

---

[1] This Opinion avoids repetition of facts pertaining to the warrant amendment claims, which were the subject of the court's Memorandum Opinion dated, November 30, 2021, as corrected on December 1, 2021.

[2] Exhibits attached to the operative complaint ("Compl."), *see Jaquith v. Vaxart, Inc.*, C.A. No. 2020-0904-PAF, Dkt. 1, will be cited as "Ex." Exhibits entered into the record by the Plaintiffs (defined below) outside of the Complaint, *see* Dkt. 128, will be cited as "Pls.' Ex." Exhibits entered into the record by the Armistice Defendants (defined below), *see* Dkt. 81, 97, and 113, will be cited as "Armistice Defs.' Ex." Exhibits entered into the record by the Vaxart Defendants (defined below), *see* Dkt. 84, 99, and 131, will be cited as "Vaxart Defs.' Ex." Plaintiffs have objected that Defendants have introduced into the record "extraneous documents" produced to Plaintiffs in response to books and records demands under 8 *Del. C.* § 220. Pls.' Ans. Br. 34. Plaintiffs' characterization of Vaxart's participation in OWS has prompted the Defendants to request that the court "review the actual documents to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks to have drawn is a reasonable one." *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *18 (Del. Ch. Jan. 27, 2021) (citations omitted). The Plaintiffs' respective confidentiality agreements with the Company governing the production of Section 220 documents each provide that all "documents" produced pursuant to the agreements "will be deemed incorporated by reference in any complaint relating to the subject matter referenced in the Demand[s]." Armistice Defs.' Exs. 1 ¶ 11, 2 ¶ 13. The confidentiality agreement between the Company and Plaintiffs Cynthia Jaquith and Paul Bergeron makes incorporation conditional upon written confirmation from the Company that it "believes in good faith that it has completed

3

## A. The Parties

Plaintiffs Cynthia Jaquith and Paul Bergeron have been Vaxart stockholders since April 2020.[3] Plaintiff Kenny Galjour alleges to have been a Vaxart stockholder "at all relevant times."[4] They are collectively referred to as "Plaintiffs" herein.

Nominal defendant Vaxart is a Delaware corporation based in San Francisco, California.[5] The Company is a clinical stage biotechnology company focused on developing oral vaccines.[6] Vaxart is the result of a 2018 reverse merger (the "Merger") between Vaxart, Inc., then a privately held company ("Private Vaxart"), and publicly traded Aviragen Therapeutics, Inc. ("Aviragen").[7] As a result of the

---

production" of all in-scope documents within five business days of making a "good-faith determination" as to such. Armistice Defs.' Ex. 2 ¶ 14. Defendants have entered into the record an October 1, 2020 letter representing that "on September 1, 2020, the Company provided the written certification required by Paragraph 14 of the Confidentiality Agreement, stating that it believes in good faith that it has completed its production of the documents that the Company stated it will produce, all of which are within the scope of the Demands." Vaxart Defs.' Ex. 28. Plaintiffs have not disputed this representation. Nevertheless, the incorporation by reference of documents produced under Section 220 "does not change the pleading standard that governs a motion to dismiss." *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 798 (Del. Ch. 2016) (emphasis omitted), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019). "If there are factual conflicts in the documents or the circumstances support competing interpretations, and if the plaintiff makes a well-pleaded factual allegation, then the allegation will be credited." *Id.*

[3] Compl. ¶ 20.

[4] Dkt. 1 ("Galjour Compl.") ¶ 17.

[5] Compl. ¶ 21.

[6] *Id.* ¶ 32.

[7] Vaxart Defs.' Ex. 3 at 95.

4

Merger, Private Vaxart became a subsidiary of Aviragen and Aviragen changed its name to Vaxart.[8] Certain Aviragen and Private Vaxart directors continued on after the Merger as directors of the post-Merger parent company ("Vaxart"), including three of the named defendants in this case.[9] Vaxart's common stock trades on the Nasdaq stock market.[10]

Defendants Steven Boyd and Keith Maher joined the Vaxart board of directors (the "Board") in October 2019.[11] Boyd is the Chief Investment Officer and Maher is a Managing Director of defendant Armistice Capital LLC ("Armistice"), a hedge fund focused on the health and consumer sectors.[12] Armistice was a Vaxart stockholder from September 26, 2019[13] until at least June 29, 2020, the date of its last publicly reported trade before the filing of the Complaint.[14] Boyd and Maher

---

[8] *Id.*

[9] *See* Vaxart, Inc., Schedule 14A (Apr. 24, 2020) (the "Proxy") at 10–12.

[10] Vaxart Defs.' Ex. 3 at Cover Page.

[11] Proxy at 10–11.

[12] Compl. ¶¶ 1, 22–24.

[13] Vaxart, Inc., Schedule 13D (Oct. 1, 2019). The court may take judicial notice of this and other SEC filings cited in this Opinion to the extent they are "matters that are not subject to reasonable dispute." *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006) (citing D.R.E. 201(b)); *see Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 n.28 (Del. 2004) (noting that courts may take judicial notice of contents of public documents such as SEC filings required by law to be filed).

[14] Vaxart, Inc., Schedule 13D (June 30, 2020).

are together the "Armistice Directors" and, together with Armistice, the "Armistice Defendants."

Defendant Wouter Latour is the Chairman of the Vaxart Board.[15] Latour served as a director and Chief Executive Officer ("CEO") of Private Vaxart since October 2011 and September 2011, respectively, through the Merger, and he has continued to serve as a director of Vaxart since then.[16] He also continued to serve as the CEO of Vaxart since the Merger until his resignation on June 14, 2020.[17]

Defendant Andrei Floroiu joined the Board on April 13, 2020.[18] On June 15, 2020, the Board appointed him to replace Latour as CEO.[19]

Defendants Michael Finney, Robert Yedid, and Todd Davis are outside directors of Vaxart. Finney joined the board of Private Vaxart in 2007 and stayed on after the Merger as a Vaxart director.[20] He also served as the CEO of Private Vaxart from 2009 until 2011.[21] Yedid and Davis were appointed to the Vaxart Board

---

[15] Compl. ¶ 25.

[16] Proxy at 9.

[17] Compl. ¶¶ 25, 101.

[18] *Id.* ¶¶ 4, 38.

[19] Vaxart, Inc., Current Report (Form 8-K) (June 15, 2020), Item 5.02. The Complaint alleges that Floroiu "served as . . . CEO of the Company since June 15, 2020." Compl. ¶ 26.

[20] Proxy at 10.

[21] *Id.*

6

in October 2019.[22]  Davis served on the Board's Compensation Committee (the "Compensation Committee") "at all times relevant hereto."[23]

Anne M. VanLent was a director of Private Vaxart from 2013[24] until the Merger and stayed on as a Vaxart director until June 8, 2020.[25]  VanLent was not nominated for reelection at the 2020 annual meeting of Vaxart stockholders.[26]

Latour, Boyd, Floroiu, Davis, Finney, Maher, Yedid, and VanLent are together referred to in this Opinion as the "Director Defendants."

## B.    Vaxart's Vaccine Development Efforts

As of December 31, 2019, Vaxart only had 14 full-time employees,[27] had experienced two consecutive years of net losses,[28] and had never brought a vaccine to market.[29]  On January 31, 2020, in the early stages of the COVID-19 pandemic, Vaxart announced it was developing a vaccine for COVID-19.[30]  Vaxart's stock

---

[22] Compl. ¶¶ 28-29.

[23] *Id.* ¶ 28.

[24] Vaxart, Inc., Form 10-K (Feb. 6, 2019) at 120.

[25] Compl. ¶ 30.

[26] *See* Proxy at 9.

[27] Vaxart, Inc., Form 10-K (Mar. 19, 2020) at 38.

[28] *Id.* at 80.

[29] Compl. ¶ 33; *see* Vaxart, Inc., Form 10-K (Mar. 19, 2020) at 38 ("[W]e . . . have not yet successfully completed a large-scale, pivotal clinical trial, obtained marketing approval, manufactured our tablet vaccine candidates at commercial scale, or conducted sales and marketing activities that will be necessary to successfully commercialize our product candidates.").

[30] Compl. ¶ 39.

price closed at $1.25 per share that day.[31] In its annual report to stockholders in March 2020, Vaxart acknowledged that its "business currently depends heavily on the successful development, regulatory approval and commercialization of our coronavirus and norovirus tablet vaccine."[32] In the ensuing months, Vaxart disclosed its incremental progress in developing its COVID-19 oral vaccine.[33]

## C. The 2019 Equity Incentive Plan

Like many early-stage biotech companies with little to no cash flow, Vaxart used equity awards to incentivize and compensate employees, directors, and contractors. In April 2019, Vaxart's stockholders approved an equity incentive plan (the "Plan").[34] The Plan authorized the Board to grant individual equity-based

---

[31] *VXRT Historical Data*, Vaxart, Inc. Common Stock, https://www.nasdaq.com/market-activity/stocks/vxrt/historical (last visited May 26, 2022). Here and elsewhere, "I take judicial notice of these reported stock prices because they are not subject to reasonable dispute." *Lee v. Pincus*, 2014 WL 6066108, at *4 n.11 (Del. Ch. Nov. 14, 2014) (citing D.R.E. 201(b)(2)).

[32] Vaxart, Inc., Form 10-K (Mar. 19, 2020) at 40.

[33] *See* Compl. ¶ 41; *see also, e.g.*, Vaxart, Inc., Current Report (Form 8-K) (April 29, 2020), Ex. 99.1 ("announced that [Vaxart's] lead vaccine candidates generated anti-SARS CoV-2 antibodies in all tested animals after the first dose"); Vaxart, Inc., Current Report (Form 8-K) (May 12, 2020), Ex. 99.1 (reporting that "the Company's lead vaccine candidates generated robust anti-SARS CoV-2 antibodies in all tested animals after both the first and second dose, with a clear boosting effect after the second dose"); Vaxart, Inc., Current Report (Form 8-K) (June 18, 2020), Ex. 99.1 (corporate presentation describing Vaxart's "Covid-19 program" as "Advancing Expeditiously").

[34] Vaxart Defs.' Ex. 2 (the "Plan").

compensation "Awards"—including stock options, restricted stock awards, and stock appreciation rights ("SARs")—to employees, directors and consultants.[35]

Subject to exceptions not pertinent here, "the aggregate number of shares of Common Stock that may be issued pursuant to Stock Awards will not exceed 1,600,000 shares" (the "Share Reserve").[36] In addition, the maximum number of shares subject to stock awards granted during any calendar year to any non-employee director, taken together with any cash fees paid by the Company to such non-employee director during such calendar year, may not exceed $600,000 in total value, "calculating the value of any such stock awards based on the grant date fair value of the stock awards for financial reporting purposes."[37]

The Plan provides that it is to be administered by the Board, which may delegate administrative authority to a Board committee.[38] The Board "delegated concurrent authority to administer the . . . Plan to [the] Compensation Committee.[39] In practice, the Compensation Committee recommended award grants to the Board,

---

[35] *Id.* § 1(a)–(c).

[36] *Id.* § 3(a)(i).

[37] *Id.* § 3(d). For newly elected or appointed directors, the threshold is $750,000 in total value for the calendar year in which they first join the Board. *Id.*

[38] *Id.* § 2(c)(i).

[39] Proxy at 25.

which acted as the final decision maker.[40] The Compensation Committee at all relevant times in this case consisted of Maher and Davis.[41]

On February 21, 2020, the Board approved an amendment to the Plan (the "Plan Amendment") that would increase the Share Reserve from 1.6 million to 8 million shares.[42] The Plan Amendment was conditioned upon stockholder approval, which the Board intended to seek at the next annual meeting of stockholders.[43] In the meantime, on March 24, 2020, the Board approved a grant of time-based stock options covering a total of 2,610,000 shares—including 900,000 shares to CEO Latour—at a per share exercise price of $1.70[44]—the closing price of Vaxart's shares on that day (the "March Awards").[45] The March Awards vested over a two-year period.[46]

---

[40] The awards at issue here were granted by the Board upon the Compensation Committee's recommendation. Vaxart Defs.' Ex. 26 at VAXART000068.

[41] Compl. ¶¶ 24, 28; Proxy at 13–14.

[42] Proxy at 21. The Complaint calls the "increase [of] the shares reserved for issuance under the Company's equity incentive plan" the "2020 Plan." Compl. ¶ 14. The Complaint alleges that "[t]he Vaxart Board approved the 2020 Plan on March 24, 2020. To effect it, the stockholders would still have to vote to approve it." *Id.* ¶ 92. The Proxy made clear that stockholders were being asked to vote on an amendment to the Plan, not to vote on the adoption of a new plan. *See* Proxy at 3 (describing "Proposal No. 3" thus: "To approve an amendment to our 2019 Equity Incentive Plan to increase the number of shares of common stock reserved for issuance thereunder by 6,400,000 shares to 8,000,000 shares.").

[43] Proxy at 21.

[44] Compl. ¶¶ 93, 94.

[45] Proxy at 22, 32.

[46] *Id.* at 32.

On April 13, 2020, the Board granted 54,720 time-based stock options to Floroiu upon his joining the Board (the "April Awards").[47]  The exercise price was $1.71,[48] the closing price of Vaxart's common stock on April 13, 2020.[49]  Floroiu's option grant was not extraordinary.  The number and terms were the same as those in the awards to new directors upon joining the board since early 2019—54,720 options, vesting over three years.[50]  At the time of grant, none of the March Awards or April Awards could be exercised, however, because the number of shares underlying those awards exceeded the number of shares remaining in the Share Reserve.  Therefore, those option awards were only exercisable if Vaxart stockholders approved the Plan Amendment at the upcoming annual meeting of stockholders.

The Board selected June 8, 2020 for the annual meeting of stockholders (the "Annual Meeting") and planned to hold a meeting of the Board immediately thereafter.  The Company issued the notice of meeting and proxy statement (the "Proxy") on April 24, 2020.  The Proxy included a proposal to amend the certificate

---

[47] *Id.* at 33.

[48] Compl. ¶ 89.

[49] Proxy at 33.

[50] *Id.* at 44.  Boyd and Maher did not receive any awards under the Plan, as dictated by Armistice's policy.  Compl. ¶ 15 n.1.

11

of incorporation to increase the number of authorized shares to 150 million.[51] The Proxy also sought stockholder approval of the Plan Amendment to increase the Share Reserve from 1.6 million to 8 million shares.[52] The Proxy disclosed that the Share Reserve had been depleted to 110,276 issuable shares.[53] The Proxy also stated:

> In determining the number of additional shares to reserve for issuance under the 2019 Plan, our board of directors considered the number of shares available for future awards, the potential dilution resulting from the proposed increase, equity plan guidelines established by certain proxy advisory firms, and advice provided by the Compensation Committee's compensation consultant.[54]

The Proxy disclosed the March Awards and the April Awards, including the terms of the specific grants to Latour, Floroiu, and two other Vaxart executives.[55] According to the Proxy, the March Awards and the April Awards would be exercisable only if stockholders approved the Plan Amendment.[56]

### D.     Operation Warp Speed

On May 15, 2020, the White House announced OWS—a "public-private partnership to facilitate the development, manufacturing, and distribution of

---

[51] Proxy at 3.

[52] *Id.*

[53] *Id.* at 19.

[54] *Id.* at 22.

[55] *Id.* at 32–33.

[56] *Id.*

COVID-19 countermeasures."[57]  OWS was an interagency federal program, led by the U.S. Department of Health and Human Services and the Department of Defense, funded with an initial budget of almost $10 billion to "accelerate the development, manufacturing, and distribution of COVID-19 vaccines, therapeutics, and diagnostics (medical countermeasures)."[58]  OWS planned to select a small number of vaccine candidates to receive coordinated government support in simultaneous vaccine development.[59]

On June 3, 2020—five days before the Annual Meeting—*Bloomberg* reported that "[t]he White House is working with seven pharmaceutical companies" as part of OWS.[60]  The *Bloomberg* article explained that "Operation Warp Speed seeks to compress a process that is typically years long into a matter of months, in part by spending as much as $10 billion on research, manufacturing and agreements to

---

[57] Compl. ¶¶ 46, 46 n.2; *see also Trump Administration Announces Framework and Leadership for 'Operation Warp Speed'*, U.S. Dept. of Defense (May 15, 2020), https://www.defense.gov/News/Releases/Release/Article/2310750/trump-administration-announces-framework-and-leadership-for-operation-warp-speed/ (last visited May 26, 2022) (the "White House Press Release").  The court is permitted to consider documents such as this press release relied upon in the Complaint. *See Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 873 (Del. 2020) (The court "may consider documents outside the pleadings when the document is integral to a plaintiff's claim and incorporated into the complaint, or when the document is not being relied upon to prove the truth of its contents" and the court "may also take judicial notice of matters that are not subject to reasonable dispute.") (cleaned up).

[58] Compl. ¶¶ 46–47; White House Press Release.

[59] Compl. ¶ 46 & n.2.

[60] *Id*. ¶¶ 45–46.

guarantee purchase of the vaccines."[61] *Bloomberg* noted that the program's stated goal of developing a vaccine before year-end "would be a remarkable feat, given the process of bringing a conventional vaccine from inception to regulatory approval takes more than a decade on average."[62] "The June 3 *Bloomberg* article revealed the names of five of the seven vaccine finalists selected for OWS. Vaxart was not one of [them]."[63]

### E.    The Day Before the Annual Meeting and Subsequent Board Meeting

On June 7, 2020—the day before the Annual Meeting and subsequent Board and committee meetings—the Compensation Committee provided the Board with recommendations for awards to be made under the Plan.[64] The recommendations, contained in a PowerPoint slide presentation and accompanying email, determined that Floroiu was ineligible for an annual grant of options because he had just joined the Board and received his initial option grant within the last six months.[65] The committee recommended that outside directors Davis, Finney, and Yedid each

---

[61] Riley Griffin and Jennifer Jacobs, *White House Works with Seven Drugmakers in 'Warp Speed' Push*, BLOOMBERG (June 3, 2020, 5:14 PM), https://www.bloomberg.com/news/articles/2020-06-03/white-house-working-with-seven-drugmakers-in-warp-speed-push.

[62] *Id.*

[63] Compl. ¶ 50.

[64] Vaxart Defs.' Ex. 24.

[65] *Id.*

14

receive an annual stock option grant covering 65,700 shares,[66] which would fully vest one year later on June 8, 2021.[67] That number was based on a "target" of 0.073% of "Total Outstanding" common stock, reflecting the 50th percentile of annual equity awards in an analysis of peer data conducted by the Compensation Committee's independent compensation consultant, Compensia, Inc.[68] The committee also recommended accelerated vesting and a two-year extension to exercise options held by VanLent, who was leaving the Board.[69] The committee noted that this treatment was consistent with prior practice for departing directors.[70] The committee did not recommend a grant of any new options to VanLent.[71]

The Board meeting agenda was circulated on June 7, 2020.[72] The agenda items included updates on "Status Covid program" and "Status COVID funding" but included no details.[73]

---

[66] Vaxart Defs.' Ex. 25 at VAXART0000016.

[67] Vaxart Defs.' Ex. 26 at VAXART0000070.

[68] Vaxart Defs.' Ex. 25 at VAXART000014; Vaxart, Inc., Schedule 14A (Apr. 30, 2021) at 34.

[69] Vaxart Defs.' Ex. 24.

[70] *Id*.

[71] Vaxart Defs.' Ex. 25 at VAXART000016.

[72] Compl. ¶ 141.

[73] Armistice Defs.' Ex. 24.

**F.** **The June 8 Meetings of the Stockholders, Compensation Committee, and Board**

The June 8, 2020 Annual Meeting was held virtually, starting at 9:30 a.m. Pacific Time.[74] The telephonic Compensation Committee meeting began at 9:45 a.m. Pacific Time.[75] According to the Compensation Committee meeting minutes, the meeting lasted 15 minutes, with the committee formally approving for submission to the Board the recommendations contained in its presentation that was circulated the prior day.[76] The full Board then met by phone at 10:00 a.m. Pacific Time.[77] Latour, Boyd, Davis, Finney, Floroiu, Maher, and Yedid attended.[78] Latour summarized the results of the Annual Meeting, reporting that stockholders had approved all of the proposals submitted for their approval.[79] Latour then updated the Board on Vaxart's COVID-19 vaccine program, noting that "the Company was invited to participate in a non-human primate study organized by Operation Warp Speed and was negotiating the relevant documentation" (the "Research Study").[80] The Board minutes reflect no other reference to that invitation.

---

[74] Vaxart Defs.' Ex. 26 at VAXART000066.

[75] Pls.' Ex. A at VAXART000007.

[76] *Id.* at VAXART000007, VAXART000008.

[77] Vaxart Defs.' Ex. 26 at VAXART000066.

[78] *Id.*

[79] *Id.*

[80] *Id.* at VAXART000067.

16

The record does not reflect precisely when Vaxart was invited to participate in the Research Study or when the directors first became aware of it. The Plaintiffs insist that "Vaxart's management, the Board, and Armistice knew as of June 3, 2020, and likely on May 28, 2020, that the Company had been chosen as an OWS participant."[81] Plaintiffs cite no document or human conduct to support that allegation other than the June 3, 2020 *Bloomberg* article.

At the June 8, 2020 Board meeting, Latour also updated directors on the development and manufacturing of the Company's oral COVID-19 vaccine candidate.[82] On the subject of COVID-19 funding, Latour summarized the status of various funding initiatives and potential funding sources,[83] which included a presentation on "BARDA/NIH (OWS)" and "[f]unding challenge study in NHP."[84]

The Compensation Committee formally presented its recommendations for annual director compensation and stock option grants.[85] The Board approved those recommendations, which accelerated vesting and extended the expiration date of VanLent's options and awarded 65,700 stock options to each of Davis, Finney, and

---

[81] Compl. ¶ 122 (emphasis omitted).

[82] Vaxart Defs.' Ex. 26 at VAXART000067.

[83] *Id.*

[84] Pls.' Ex. B at VAXART000049.

[85] Vaxart Defs.' Ex. 26 at VAXART000068.

Yedid.[86]  The exercise price of the options awarded to Davis, Finney, and Yedid was $2.39, which was the closing price of Vaxart's common stock on the Nasdaq that day.[87]

Five days after this Board meeting, the Board executed a written consent deeming it in Vaxart's best interests that Latour resign from his position as President and CEO,[88] but providing for him to remain on the Board.  The Board also approved a separation agreement with Latour, permitting his stock options to "vest for so long as he continues to serve on the Board."[89]  The separation agreement included a general release of claims that Latour may have against the Company, its officers, directors, agents, and others.[90]

On June 15, 2020, the Company announced Latour's resignation and the appointment of Floroiu as his successor.[91]  No explanation was provided for Latour's resignation.[92]

---

[86] *Id.* at VAXART000068, VAXART000070.

[87] *VXRT Historical Data*, Vaxart, Inc. Common Stock, https://www.nasdaq.com/market-activity/stocks/vxrt/historical (last visited May 26, 2022).

[88] Compl. ¶ 102; Vaxart Defs.' Ex. 27.

[89] Vaxart Defs.' Ex. 27.

[90] Vaxart Defs.' Ex. 9 at §§ 2(b), 3, Ex. C.  On June 15, 2020, the Company announced Latour's resignation and the appointment of Floroiu as his successor.  Compl. ¶ 103; Vaxart, Inc., Current Report (Form 8-K) (June 15, 2020).

[91] Compl. ¶ 101; Vaxart, Inc., Current Report (Form 8-K) (June 15, 2020).

[92] Compl. ¶ 101; *see* Vaxart Defs.' Ex. 27.

Upon his appointment as CEO, Floroiu received time-based stock options to purchase 1,745,280 shares of Vaxart's common stock at a strike price of $2.46 per share, the closing price of Vaxart shares on June 15, 2020.[93] A quarter of the stock option grant would vest on June 15, 2021, and the remaining options would vest in equal monthly installments over the following three-year period, subject to acceleration under certain circumstances.[94] Floroiu also received performance-based stock options to purchase up to 900,000 shares of Vaxart's common stock at a strike price of $2.46 per share.[95] One-third of the performance-based stock options would vest if Vaxart's shares closed at a per share price of $5, $7.50 and $10, respectively, for ten consecutive trading days between June 15 and November 30, 2020.[96]

### G. Vaxart's June 24, 25, and 26, 2020 Announcements and the Aftermath

Two weeks after the Annual Meeting, Vaxart made three public announcements on three consecutive days. On June 24, 2020, the Company announced that it would be included in the Russell 3000 Index, effective June 29,

---

[93] Compl. ¶¶ 103–04.

[94] *Id.* ¶ 104; Vaxart Defs.' Ex. 27.

[95] Compl. ¶ 105.

[96] *Id.*; Vaxart Defs.' Ex. 27.

2020.[97]  "On this news, Vaxart's stock increased nearly 20%, from a closing price of $2.66 on June 23, 2020 to a closing price of $3.19 on June 24, 2020."[98]  On June 25, 2020, Vaxart announced a memorandum of understanding with Attwill Medical Solutions Steriflow, LP ("Attwill") to manufacture Vaxart's oral COVID-19 vaccine.[99]  The subheadline of the Company's news release announcing the deal stated that the agreement had the effect of "Enabling Production of A Billion or More COVID-19 Vaccine Doses Per Year."[100]  The Company's stock price closed at $6.26 per share that day, as compared to $2.66 per share on June 23, 2020 and $3.19 per share on June 24, 2020.[101]  The third announcement in this string is at the center of this case—Vaxart's invitation to participate in the OWS-sponsored, non-human primate study.

To place the announcement into proper context, as of late June 2020, OWS had not yet identified all the participants in the vaccine development program.  The

---

[97] Compl. ¶ 111; *see Vaxart, Inc. Set to Join Russell 3000® Index*, Vaxart, Inc. (June 24, 2020, 8:00 AM), https://investors.vaxart.com/news-releases/news-release-details/vaxart-inc-set-join-russell-3000r-index.  The court can take judicial notice of Vaxart's announcements as a "publicly available press release."  *In re Duke Energy Corp. Deriv. Litig.*, 2016 WL 4543788, at *4 n.34 (Del. Ch. Aug. 31, 2016).

[98] Compl. ¶ 111.

[99] *Id*. ¶ 112.

[100] Vaxart, Inc., Current Report (Form 8-K) (June 30, 2020), Ex. 99.1.

[101] *VXRT Historical Data*, Vaxart, Inc. Common Stock, https://www.nasdaq.com/market-activity/stocks/vxrt/historical (last visited May 26, 2022).

market was aware of the five participants that had been disclosed in the June 3 *Bloomberg* article. Here is the substantive portion of the June 26, 2020 press release:

Vaxart's COVID-19 Vaccine Selected for the U.S. Government's
Operation Warp Speed

**OWS to Test First Oral COVID-19 Vaccine in Non-Human
Primates**

SOUTH SAN FRANCISCO, Calif., June 26, 2020 (GLOBE NEWSWIRE) -- Vaxart, Inc., a clinical-stage biotechnology company developing oral vaccines that are administered by tablet rather than by injection, today announced that its oral COVID-19 vaccine has been selected to participate in a non-human primate (NHP) challenge study, organized and funded by Operation Warp Speed, a new national program aiming to provide substantial quantities of safe, effective vaccine for Americans by January 2021.

The study is designed to demonstrate the efficacy of Vaxart's oral COVID-19 vaccine candidate.

"We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated. SARS-CoV-2, the coronavirus that causes COVID-19, is primarily transmitted by viral particles that enter through the mucosa - nose, mouth or eyes - strongly suggesting that mucosal immunity could serve as the first line of defense," said Andrei Floroiu, Chief Executive Officer of Vaxart Inc. "In addition, our vaccine is a room temperature-stable tablet, an enormous logistical advantage in large vaccination campaigns." [102]

---

[102] Vaxart, Inc., Current Report (Form 8-K) (June 30, 2020), Ex. 99.2. Vaxart filed the July 25, 2020 press release at the same time.

"On this news, Vaxart's stock price jumped to a high of $14.30 and closed at $8.04 on June 26, 2020," compared to the prior day's close of $6.26.[103] The stock closed at $6.44 on July 6, 2020.[104] Three weeks after the trio of press releases, starting July 13, 2021, Vaxart's stock price closed above $10 a share for 13 consecutive trading days.[105] As a result, Floroiu's 900,000 performance-based options became fully vested. Vaxart's public relations campaign and sharp increase in its stock price during that period caught the eye of regulators and law enforcement.

In July 2020, Vaxart was served with a grand jury subpoena from the U.S. Attorney's Office for the Northern District of California.[106] Pursuant to this subpoena, Vaxart produced documents relating to its "participation in, and disclosure of, an [OWS]-funded non-human primate study, and option grants, warrant transactions, and other corporate and financing matters disclosed since March 2020."[107]

---

[103] Compl. ¶¶ 112–13.

[104] *VXRT Historical Data*, Vaxart, Inc. Common Stock, https://www.nasdaq.com/market-activity/stocks/vxrt/historical (last visited May 26, 2022).

[105] Compl. ¶ 108. The Complaint does not contain any allegations concerning Vaxart's public statements about its vaccine development after June 26, 2020.

[106] *Id.* ¶ 120; Vaxart, Inc., Current Report (Form 8-K) (Oct. 14, 2020), Item 8.01. The Form 8-K did not specify the date Vaxart was served with the subpoena.

[107] Compl. ¶ 120; Vaxart, Inc., Current Report (Form 8-K) (Oct. 14, 2020), Item 8.01.

On Saturday, July 25, 2020, *The New York Times* reported that "[s]ome officials at the Department of Health and Human Services have grown concerned about whether companies including Vaxart are trying to inflate their stock prices by exaggerating their roles in Warp Speed."[108] The article quoted a Department official, who confirmed that the Department "has entered into funding agreements with certain vaccine manufacturers" and was "negotiating with others."[109] The official also clarified: "[n]either is the case with Vaxart."[110] Vaxart's stock price opened on the following Monday, July 27, 2020, at $10.34 per share—down 15.86% from its closing price the previous Friday. That same day, Vaxart's stock price closed at approximately $11.16 per share, down 9.19% from the previous closing price. Between July 27, 2020 and September 8, 2020, Vaxart's shares dropped 56.81%.[111]

In August 2020, the Company voluntarily responded to a document request from the Enforcement Division of the U.S. Securities and Exchange Commission, providing documents similar to those given in response to the California grand jury

---

[108] David Gelles & Jesse Drucker, *Corporate Insiders Pocket $1 Billion in Rush for Coronavirus Vaccine*, N.Y. TIMES (July 25, 2020), https://www.nytimes.com/2020/07/25/business/coronavirus-vaccine-profits-vaxart.html?smid=url-share (the "NYT Article"). The Complaint incorporates the article by reference. *See* Compl. ¶ 118 (quoting the article).

[109] NYT Article.

[110] *Id.*

[111] *VXRT Historical Data*, Vaxart, Inc. Common Stock, https://www.nasdaq.com/market-activity/stocks/vxrt/historical (last visited May 26, 2022).

subpoena.[112]  Two months later, in October 2020, the Office of the U.S. Attorney for the Northern District of California transferred its investigation to the Office of the U.S. Attorney for the Eastern District of New York and the Fraud Section of Main Justice.[113]  The New York investigators then issued a grand jury subpoena seeking substantially the same information provided in response to the California grand jury subpoena.[114]

## II.  PROCEDURAL HISTORY

### A.  This Action

On September 8, 2020, Plaintiff Kenny Galjour filed his complaint.  On October 20, 2020, Plaintiffs Cynthia Jaquith and Paul Bergeron filed their complaint. The court consolidated the actions on November 12, 2020,[115]  and the Plaintiffs designated the Jaquith-Bergeron complaint as the operative complaint.[116] Defendants moved to dismiss.[117]  On November 30, 2021, the court issued a Memorandum Opinion,[118]  corrected on December 1, 2021,[119] dismissing Counts I,

---

[112] Compl. ¶ 121; Vaxart, Inc., Current Report (Form 8-K) (Oct. 14, 2020), Item 8.01.

[113] Pls.' Ans. Br. 17; Vaxart, Inc., Form 10-K (Feb. 24, 2022) at 56.

[114] Pls.' Ans. Br. 17; Vaxart, Inc., Form 10-K (Feb. 24, 2022) at 56.

[115] Dkt. 53.

[116] Dkt. 72.

[117] Dkt. 74, 75.

[118] Dkt. 122.

[119] Dkt. 123.

IV and V.[120]  Thereafter, the court requested supplemental briefing as to two issues related to Counts II and III.[121]  The parties completed briefing on February 4, 2022.[122]

## B.  The California Actions

### 1.  The California State Court Action

On August 4, 2020, other Vaxart stockholders initiated litigation against Floroiu, Latour, Davis, Finney, Yedid, Boyd, and Maher (the "California Defendants") in the California Superior Court in San Mateo County (the "California Litigation").[123]  On November 25, 2020, the plaintiffs in the California Litigation filed a Second Amended Complaint asserting claims for breach of fiduciary duties, unjust enrichment, waste, and aiding and abetting breach of fiduciary duties, relating to alleged "spring-loaded" stock option grants.[124]

On March 15, 2021, the California Superior Court granted the California Defendants' demurrer, without prejudice and with leave to replead.[125]  On June 17,

---

[120] Count I was a breach of fiduciary duty claim asserted against the Director Defendants for the approval of the warrant amendments (the "Warrant Amendments").  Count IV was an unjust enrichment claim asserted against Armistice for the retention of the Warrant Amendments.  Count V was a breach of fiduciary duty claim asserted against Armistice.

[121] Dkt. 125.

[122] Dkt. 139–40.

[123] Defs.' Joint Suppl. Br. in Further Supp. of Their Mots. to Dismiss, Ex. 37.

[124] *Id.*; *Ennis v. Latour*, 20-civ-03253 (Cal. Super. Ct. Nov. 25, 2020).

[125] Dkt. 116, Ex. B at 3; *Ennis v. Latour*, 20-civ-03253 (Cal. Super. Ct. Mar. 15, 2021).

25

2021, the plaintiffs in the California action filed a Third Amended Complaint.[126] On April 26, 2022, the California Court sustained the California Defendants' demurrers without leave to amend as to all claims asserted against Armistice and the unjust enrichment and aiding and abetting claims against the Armistice Directors relating to the Warrant Amendments.[127] In its ruling, the California Court agreed with this court's holdings that the Warrant Amendments must be treated as a transaction separate from the June Awards, that the stockholder plaintiffs failed to sufficiently allege a *quid pro quo* arrangement between the Armistice Defendants and the other director defendants, and that demand was not excused as to any claims relating to the Warrant Amendments.[128] The California Court has deferred ruling on the remaining claims pending this court's decision.[129]

### 2. The Federal Securities Actions

On August 24, 2020, a securities fraud action was initiated by a Vaxart stockholder in California federal court against the Company, Floroiu, Latour, and

---

[126] *Ennis v. Latour*, 20-civ-03253 (Cal. Super. Ct. June 17, 2021).

[127] *Ennis v. Latour*, 20-civ-03253 (Cal. Super. Ct. Apr. 26, 2022). The California Court also acknowledged that "Plaintiffs have now had three opportunities to amend their complaint" and concluded that "there is no reasonable possibility that Plaintiffs can amend their complaint to allege demand futility as to the claims relating to the Warrant Amendments." *Id.* at 13.

[128] *Id.*

[129] *Ennis v. Latour*, 20-civ-03253 (Cal. Super. Ct. Apr. 26, 2022).

the Armistice Defendants.[130]  The case was consolidated with several other similar cases, and on January 29, 2021, the plaintiffs filed a consolidated amended complaint adding Yedid, Davis, and Finney, and two Vaxart officers, Sean Tucker and Margaret Echerd, as defendants.[131]  On December 22, 2021, the court dismissed the claims against Armistice but denied the motion to dismiss the consolidated amended complaint as to the other defendants (the "Order").

In the Order, the court reasoned that the June 26, 2020 press release announcing Vaxart's participation in the non-human primate study, together with the previous day's press release announcing the agreement with Attwill, "created the materially misleading impression that Vaxart stood at the precipice of pioneering a successful coronavirus vaccine."[132]  Because "Attwill lacked the regulatory capacity, personnel, and wherewithal to produce even one dose, never mind one billion," the Attwill announcement created the misleading impression that the Company had entered into the agreement because it was on the "cusp of achieving something momentous."[133]  As to the announcement of the non-human primate study selection, the court reasoned that, even if the press release was "literally true," its timing and

---

[130] *In re Vaxart, Inc. Sec. Litig.*, 3:20-cv-05949-VC (N.D. Cal. Aug. 24, 2020).

[131] *In re Vaxart, Inc. Sec. Litig.*, 3:20-cv-05949-VC (N.D. Cal. Jan. 29, 2021).

[132] *In re Vaxart, Inc. Sec. Litig.*, 2021 WL 6061518, at *4 (N.D. Cal. Dec. 22, 2021).

[133] *Id.*

eye-catching title obscured the "crucial reality that Vaxart had been chosen only to participate in a primate study and not to receive a vast influx of federal funds."[134]

On October 23, 2020, another Vaxart stockholder commenced a securities class action against Armistice, Armistice Capital Master Fund Ltd., Boyd, and Vaxart (as nominal defendant) in the United States District Court for the Southern District of New York.[135] The plaintiff sought the disgorgement of all profits realized by the defendants, in violation of Section 16(a) of the Securities Exchange Act of 1934,[136] through the Warrant Amendments.[137] The defendants moved to dismiss the complaint, arguing that the Warrant Amendments were not so substantial and material as to constitute a purchases of securities within the meaning of the statute.[138] On March 29, 2022, the court denied the motion, finding that the plaintiff had plausibly alleged that the Warrant Amendments were "tantamount to the purchase of new securities" as they enabled the defendants to more expeditiously exercise the warrants and to hold significantly more stock while executing them.[139]

---

[134] *Id.* at *5.

[135] *Roth v. Armistice Capital, LLC*, 1:20-CV-08872 (S.D.N.Y. Oct. 23, 2020).

[136] *See* 15 U.S.C. § 78p(a).

[137] *Roth v. Armistice Capital, LLC*, 2022 WL 912942, at *2 (S.D.N.Y. Mar. 29, 2022).

[138] *Id.* at *3.

[139] *Id.* at *3–4.

## III. ANALYSIS

Count II is a direct claim alleging the Director Defendants breached their fiduciary duties by failing to disclose Vaxart's selection to participate in the Research Study prior to the stockholder vote on the Plan Amendment. Count III asserts that Floroiu, Latour, Davis, Finney, Yedid, and VanLent were unjustly enriched through their receipt of "stock options whose value they knew would be inflated by the OWS announcement."[140]

### A. Standard of Review

On a motion to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6):

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (cleaned up). At the motion to dismiss stage, "[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences." *White v. Panic*, 783 A.2d 543, 549 (Del. 2001) (citation omitted). "[A] claim may be dismissed if

---

[140] Compl. ¶ 179.

29

allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law." *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001). The court also need not "accept every strained interpretation of the allegations proposed by the plaintiff." *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Malpiede*, 780 A.2d at 1083).

> **B. Count II Is Dismissed Because the Directors Were Not Required to Supplement the Proxy with Details of Vaxart's Selection to Participate in the Non-Human Primate Study.**

Count II alleges that each of the Director Defendants breached their fiduciary duties by not supplementing the Proxy with news about Vaxart's selection to participate in the Research Study. Plaintiffs maintain that this disclosure breach rendered the stockholder vote on the Plan Amendment uninformed and, therefore, the Plan Amendment is invalid.[141] Plaintiffs seek an order rescinding all options awarded under the Plan, as amended, and directing a new "fully informed stockholder vote."[142]

---

[141] Compl. ¶ 175.

[142] Compl. § VI, D & E (Requests for Relief). At the 2021 annual meeting, Vaxart stockholders approved another amendment to the Plan, this time increasing the number of shares underlying awards to 16,900,000 shares. Vaxart, Inc., Current Report (Form 8-K) (June 21, 2021), Item 5.07. The proxy statement disseminated to stockholders in connection with the vote on that amendment did not seek to ratify any prior awards under the Plan. Vaxart, Inc., Schedule 14A (Apr. 28, 2021).

"It is well-settled law that directors of Delaware corporations [have] a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Gantler v. Stephens*, 965 A.2d 695, 710 (Del. 2009) (internal quotations omitted). "That duty attaches to proxy statements and any other disclosures in contemplation of stockholder action." *Id.* (internal quotations omitted). The adequacy of a disclosure is a mixed question of law and fact. *In re Om Grp., Inc. S'holders Litig.*, 2016 WL 5929951, at *12 (Del. Ch. Oct. 12, 2016) (citing *Zirn v. VLI Corp.*, 681 A.2d 1050, 1055 (Del. 1996)). This court should deny a motion to dismiss "when developing the factual record may be necessary to make a materiality determination." *See Davidow v. LRN Corp.*, 2020 WL 898097, at *8 (Del. Ch. Feb. 25, 2020) (collecting cases). Plaintiffs alleging a disclosure claim must, however, "provide some basis for a court to infer that the alleged violations were material." *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 141 (Del. 1997). "This Court has, on several occasions in the context of a motion to dismiss, found it appropriate to dismiss disclosure claims on the basis that the complained of omission was not material." *Orman v. Cullman*, 794 A.2d 5, 32 (Del. Ch. 2002) (citing *Malpeide v. Townson*, 780 A.2d 1075, 1086 n.35 (Del. 2001)).[143]

---

[143] *See, e.g.*, *Feldman v. AS Roma SPV GP, LLC*, 2021 WL 3087042 (Del. Ch. July 22, 2021) (granting motion to dismiss disclosure claims alleging material omissions in

"To state a claim for breach by omission of any duty to disclose, a plaintiff must plead facts identifying (1) material, (2) reasonably available (3) information that (4) was omitted from the proxy materials." *Pfeffer v. Redstone*, 965 A.2d 676, 686 (Del. 2009) (citation omitted). "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). The materiality test "does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote." *Id.* (quoting *TSC*, 426 U.S. at 449). "[D]irectors are not required to disclose all available information, but only that information necessary to make the disclosure of their recommendation materially accurate and complete." *Matador Cap. Mgmt. Corp. v. BRC Hldgs., Inc.*, 729 A.2d 280, 295 (Del. Ch. 1998) (internal quotations omitted).

There is no dispute that Vaxart had not yet been invited to participate in the Research Study when Vaxart disseminated the Proxy to stockholders on April 24, 2020. Thus, the issue on this motion as to Count II is whether the Director

financial statements and member loan materials); *Pascal on behalf of Columbia Fin., Inc. v. Czerwinski*, 2020 WL 7383107, at *6–7 (Del. Ch. Dec. 16, 2020) (granting motion to dismiss disclosure claims alleging material omissions in proxy materials); *Chatham Asset Mgmt., LLC v. Papanier*, 2020 WL 204027 (Del. Ch. Jan. 13, 2020) (granting motion to dismiss disclosure claims alleging material omissions in tender offer materials); *Shaev v. Adkerson*, 2015 WL 5882942, at *11 (Del. Ch. Oct. 5, 2015) (granting motion to dismiss disclosure claims alleging material omissions in proxy materials).

Defendants had a duty to supplement the Proxy prior to the Annual Meeting with information about the invitation to participate in the Research Study.

The Delaware Supreme Court addressed a fiduciary's duty to supplement its disclosure in *Kahn v. Household Acquisition Corp.*, 591 A.2d 166 (Del. 1991). In *Household*, stockholder plaintiffs alleged that a proxy statement disseminated in connection with a proposed merger should have been supplemented with post-proxy information that would have provided more clarity as to the company's projected earnings. Specifically, the proxy disclosed that the company and the federal government were in negotiations over the amount of an annual government subsidy. The proxy included both the company's ask and the government's bid. Less than two weeks after the issuance of the proxy, the company and government negotiators reached a preliminary agreement on the amount of the subsidy, which represented a compromise between the bid and ask. The deal was not finalized until after stockholders had voted to approve the merger. In a post-trial opinion, the Court of Chancery concluded the information was not material. In affirming that conclusion, the Delaware Supreme Court articulated a fiduciary's duty to disclose subsequent events:

> [S]ubsequent events may have significance, and thus require disclosure, only as they relate to information originally disclosed. If subsequent events impart a new and significant slant on information already discussed, their disclosure is mandated. If the subsequent event is tentative, ill defined or adds little to material already disclosed, the duty of fresh disclosure is limited.

33

*Id.* at 171.

The Court did not expand on the "limited" nature of the disclosure duty in the last sentence of the quotation above. The Court concluded that in the case before it, the tentative agreement on the amount of the subsidy "did not introduce a significant new fact into the mix of financial data already available to shareholders." *Id.* The Court also emphasized the tentative nature of the agreement. *Id.* ("[T]hat which plaintiff characterizes as an 'agreement in principle' had been reached at the staff level and was subject to approval, and possible modification, at the [government agency] level."). In addition, the principal author of the fairness opinion presented to the board testified that the agreement would not have altered his previous views of the merger. *Id.* at 172.

The Director Defendants here argue that Plaintiffs have failed to meet their burden to plead an omission claim for three primary reasons. First, the Director Defendants contend that news of the Research Study Selection was not "reasonably available" to the Board because "there is no basis for Plaintiffs' speculation that the Board knew about the [Research Study Selection] prior to the June 8, 2020 Board meeting, which took place *after* the Annual Meeting."[144] Second, the Director Defendants argue that even if the Board had knowledge of that information,

---

[144] Vaxart Defs.' Op. Br. at 56 (emphasis in original).

Plaintiffs have failed to adequately allege that the information was material.[145] Third, the Director Defendants contend that even if such information *were* material, Plaintiffs have failed to adequately plead that the Board acted in bad faith.[146]

The viability of the disclosure claim turns on the allegations concerning the significance of the Research Study selection. Plaintiffs allege that Latour, as the Company's CEO, must have learned of the Research Study selection before the June 8, 2020 Board meeting[147] and that "it is implausible Latour would not immediately inform the members of the Board of the news."[148] That, Plaintiffs maintain, is because the Research Study Selection was a "watershed moment" for the Company:[149]

> Selection to participate in OWS would mean that Vaxart is no longer one of many clinical stage biopharmaceutical companies enmeshed in the slow struggle to commercialize a drug, but instead now has access to the U.S. government's substantial resources, with its COVID-19 vaccine candidate having a path to be put on a fast-track regulatory timeline.[150]

---

[145] *Id.* at 56–67.

[146] Vaxart Defs.' Op. Br. at 57–58; Vaxart Defs.' Op. Suppl. Br. at 2.

[147] Compl. ¶ 52.

[148] *Id.*; *see also* Compl. ¶ 57 ("Latour surely kept his fellow Board members apprised of the status of this make-or-break negotiation with the government."); *id.* ¶ 58 ("Latour would surely have immediately passed on this monumental news to his successor the moment he was informed. And, Floroiu would have just as surely passed along the information to his old Armistice and McKinsey colleague, Boyd.").

[149] Compl. ¶ 52.

[150] *Id.* ¶ 49.

"Selection to participate in OWS," this argument goes, "dramatically increased the likelihood that Vaxart's COVID-19 vaccine candidate would be commercialized"[151] and would thus "dramatically increase Vaxart's stock price."[152] Plaintiffs further allege that "the options . . . the stockholders were voting on were significantly more valuable than stockholders could have understood based on the information available."[153] And so, Plaintiffs allege, "[t]his extraordinary increase in the value of stock option awards was material information any reasonable stockholder would have wanted to consider before voting on the proposal."[154]

Plaintiffs' theory is based on an inaccurate characterization of what stockholders were being asked to approve at the Annual Meeting. The Plan Amendment sought to increase the number of shares in the Share Reserve. Stockholders were not being asked to vote directly on the March Awards or the April Awards, although the outcome of the vote on the Plan Amendment would determine whether those awards could be exercised.

It is reasonable to infer that Latour had knowledge about the invitation to participate in the Research Study before June 8, 2020. But the Complaint fails to plead facts supporting a critical link in this logical chain: that participation in the

---

[151] *Id.* ¶ 135.

[152] *Id.* ¶ 96.

[153] *Id.*

[154] Pls.' Suppl. Ans. Br. at 5.

non-human research study was a watershed event that would cause "a massive increase in the value" of the March and April Awards.[155] Absent any facts to support that inference, the entire argument founders.

### 1. The Complaint Fails to Support the Inference that the Research Study Selection Was Material to Stockholders Voting on the Plan Amendment.

"Where shareholder ratification of a plan of option compensation is involved, the duty of disclosure is satisfied by the disclosure or fair summary of all of the relevant terms and conditions of the proposed plan of compensation, together with any material extrinsic fact within the board's knowledge bearing on the issue." *Lewis v. Vogelstein*, 699 A.2d 327, 333 (Del. Ch. 1997). The Proxy disclosed the terms of the Plan, the terms of the Plan Amendment, and the reasons for which the amendment was sought. The Proxy contained only a generic statement about the Company's efforts to develop its COVID-19 vaccine.[156] Plaintiffs insist, however, that the invitation to participate in the non-human primate study was material information that needed to be disseminated in a supplement to the Proxy.

---

[155] Compl. ¶ 97.

[156] Proxy at 2 ("We are developing prophylactic vaccine candidates that target a range of infectious diseases. These include coronavirus disease 2019, or COVID-19, a coronavirus currently causing an epidemic throughout the world; norovirus, a widespread cause of acute gastro-intestinal enteritis . . . ; seasonal influenza . . . ; and respiratory syncytial virus, a common cause of respiratory tract infections.").

37

*Vogelstein* is instructive.  In that case, Chancellor Allen granted a motion to dismiss claims alleging a stockholder vote on a stock option plan was uniformed. The plaintiff argued the failure to include option values derived from the Black-Scholes option pricing model was a material omission.  The court disagreed, concluding that such "soft information" was immaterial. *Id.* at 333.  Even closer to the facts of the present case is *In re 3COM Corp. Shareholders Litigation*, 1999 WL 1009210 (Del. Ch. Oct. 25, 1999).  As here, plaintiffs in *3COM* alleged that a stockholder vote approving an increase in the number of shares available for issuance under a stock option plan was uninformed.  In dismissing the action, former Chief Justice, then-Vice Chancellor, Steele held that the option values derived from a Black-Scholes model were not material and did not need to be disclosed. *Id.* at *6; *see also id.* (finding that the "mere[] approval of an amendment to a plan already in existence," in comparison to the "wholesale adoption of a stock option plan," is "even less cause" for the valuation disclosures alleged material by the plaintiff).

Here, Plaintiffs' materiality argument is at least one step removed from that in *Vogelstein* and *3COM*.  Plaintiffs argue not, as in *Vogelstein* and *3COM*, that valuation information was omitted; instead, they assert that an invitation to participate in a research study would have caused an increase in the value of

38

previously granted options in some unknown, but "massive," amount.[157] Plaintiffs argue a reasonable stockholder voting on the Plan Amendment would have wanted to know that stock options already granted would increase in value upon the announcement of positive news about the Company. As the theory goes, stockholders might not vote in favor of increasing the number of shares eligible for a grant under the Plan if they knew the options would become more valuable upon the Company's announcement of positive news and a subsequent increase in the stock price.[158]

Plaintiffs' theory does not hold together under the facts alleged in the Complaint. The invitation to participate in the Research Study is even softer information than the option pricing model information deemed immaterial in

---

[157] Compl. ¶¶ 95–96.

[158] "Most companies garner strong equity plan proposal support from shareholders, regardless of the say-on-pay results." Brian V. Breheny, Joseph M. Yaffe & Caroline S. Kim, Skadden, Arps, Slate, Meagher & Flom LLP, *Say-on-Pay Votes and Compensation Disclosures,* Harv. L. Sch. Forum on Corporate Governance (Jan. 6, 2021), https://corpgov.law.harvard.edu/2021/01/06/say-on-pay-votes-and-compensation-disclosures/. *See id.* ("As of September 2020, Russell 3000 companies with less than 70% say-on-pay approval that presented an equity plan proposal still received 82% support for the equity plan proposal."). If anything, the connection became even more tenuous in 2021. Semler Brossy, *2021 Say on Pay & Proxy Results: Russell 3000* (Sept. 30, 2021) ("Companies receiving less than 70% Say on Pay vote support have had slightly higher average equity plan proposal vote support in 2021 (86%) than in previous years."). "Indeed," a recent study concludes, "in the absence of poor economic performance, shareholders do not appear to care about excess executive compensation." Jill E. Fisch, Darius Palia & Steven Davidoff Solomon, *Is Say on Pay All About Pay? The Impact of Firm Performance*, 8 Harv. Bus. L. Rev. 101, 109 (2018).

*Vogelstein* and *3COM*. First, the invitation was subject to negotiation and not definitive.[159] *See Household*, 591 A.2d at 171 (holding disclosure of an agreement in principle on government subsidy was not material information requiring supplemental disclosure). More problematic for the Plaintiffs here is that nothing in the Complaint supports the inference that an invitation to participate in the Research Study would have caused the Company's stock price to increase "dramatically."[160]

The Federal Food, Drug, and Cosmetic Act ("FDCA") mandates that all drugs marketed or sold in interstate commerce maintain FDA approval. 21 U.S.C. § 355(a). In its March 2019 Annual Report, Vaxart summarized the U.S. Product Development Process as follows:

> The process required by the FDA before a drug or biological product may be marketed in the United States generally involves the following:
> - completion of nonclinical laboratory tests and animal studies . . .;
> - submission to the FDA of an IND which must become effective before human clinical trials may begin;
> - performance of adequate and well-controlled human clinical trials . . .;
> - submission to the FDA of a Biologics License Application, or BLA, for marketing approval . . .;
> - satisfactory completion of an FDA inspection of the manufacturing facility or facilities where the biological product is produced . . .;
> - potential FDA audit of the nonclinical study and clinical trial sites that generated the data in support of the BLA; and

---

[159] Compl. ¶¶ 53, 56.

[160] *Id.* ¶ 96.

40

- FDA review and approval, or licensure, of the BLA.[161]

Preclinical testing of laboratory animals is merely the first step on this long road. "Most drugs that undergo preclinical (animal) testing never even make it to human testing and review by the FDA."[162]

Plaintiffs allege no well-pleaded facts and present no argument to support their assertion that Vaxart's selection to participate in a non-human primate study was a "watershed" moment for the Company. In fact, Vaxart was already engaged in preclinical studies for its COVID-19 vaccine at the time of the Research Study Selection. On May 12, 2020, the Company reported that "[i]n preclinical testing, the Company's lead vaccine candidates generated robust anti-SARS CoV-2 antibodies in all tested animals after both the first and second dose, with a clear boosting effect after the second dose."[163]

---

[161] Vaxart, Inc., Form 10-K (Mar. 19, 2020) at 32. The process to obtain FDA approval is "both onerous and lengthy." *Mut. Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 476 (2013); *see also* Compl. ¶ 48 ("Drug development is an expensive, risky process. Only a fraction of drugs that have an Investigational New Drug Application approved by the FDA—which allows the company to initiate Phase 1 trials—ever make it to market."). It takes an average of 12 years to reach market approval and requires millions, or hundreds of millions, in funding. *See* Gail A. Van Norman, *Drugs, Devices, and the FDA: Part 1: An Overview of Approval Processes for Drugs*, 1 JACC: BASIC TO TRANSLATIONAL SCI. 170, 170 (2016); *see also id.* ("A recent analysis suggests that the actual cost of taking a new drug from concept to market as of 2014 is now above $1.3 billion").

[162] *The FDA's Drug Review Process: Ensuring Drugs Are Safe and Effective*, U.S. Food & Drug Administration (last updated Nov. 24, 2017), https://www.fda.gov/drugs/information-consumers-and-patients-drugs/fdas-drug-review-process-ensuring-drugs-are-safe-and-effective.

[163] Vaxart, Inc., Current Report (Form 8-K) (May 12, 2020), Ex. 99.1.

The Company's selection to participate in the non-human primate study did not "impart a new and significant slant on information already discussed" in the Proxy.[164] The Complaint's allegations as to the significance of this event are conclusory assertions that are based upon a misreading of the June 26 press release, conflating Vaxart's invitation to participate in a non-human primate study with being selected as one of the participants in vaccine development with the government. For example, the Complaint alleges:

- "Selection to participate in OWS would mean that Vaxart is no longer one of many clinical stage biopharmaceutical companies enmeshed in the slow struggle to commercialize a drug, but instead now has access to the U.S. government's substantial resources, with its COVID-19 vaccine candidate having a path to be put on a fast-track regulatory timeline."[165]

- "Selection to participate in OWS dramatically increased the likelihood that Vaxart's COVID-19 vaccine candidate would be commercialized."[166]

- "This selection was a watershed moment for the Company . . . ."[167]

- "[T]he Company knew that, following the imminent announcement of its OWS participation, it would be able to raise equity capital at a much greater valuation . . . ."[168]

---

[164] *Household*, 591 A.2d at 171.

[165] Compl. ¶ 49.

[166] *Id.* ¶ 135.

[167] *Id.* ¶ 52.

[168] *Id.* ¶ 71.

42

- "The Board, of course, knew that public disclosure of the Company's selection to participate in OWS would lead to Vaxart's stock price skyrocketing . . . ."[169]

- "[T]he Vaxart Board and management kn[e]w that the OWS announcement would cause its stock price to rise drastically . . . ."[170]

- "[The directors] were set to receive options that they knew would become worth millions of dollars as soon as the OWS selection was announced."[171]

- The Board should have delayed the annual meeting "so that the stockholders could vote on the plan with full knowledge of the inflationary effect the OWS selection would have on the value of the Board's option grants."[172]

- "As the Board knew, the OWS selection would dramatically increase Vaxart's stock price. Accordingly, the options to be awarded under the 2020 Plan the stockholders were voting on were significantly more valuable than stockholders could have understood based on the information available."[173]

- "Because of their knowledge of the OWS selection, the Vaxart Board knew these options were far more valuable than would be apparent to any outside observer, like a compensation consultant, or was known to the stockholders who voted to approve the 2020 Plan."[174]

There are no well-pleaded allegations that the Board "knew" on or before June 8, 2020 that disclosure of the invitation to participate in a non-human primate study would put the Company on a fast-track to obtain regulatory approval for its oral

---

[169] *Id.* ¶ 84.

[170] *Id.* ¶¶ 86, 124.

[171] *Id.* ¶ 14.

[172] *Id.* ¶ 15.

[173] *Id.* ¶ 96.

[174] *Id.* ¶ 107.

COVID-19 vaccine, give the Company access to government funding for its vaccine, cause the Company's stock price to increase drastically, or cause the value of the Director Defendants' options to increase dramatically in value. Had Vaxart been selected as one of the OWS finalists to receive government funding for vaccine development, Plaintiffs might have a better claim, but that is not what happened.

The Complaint conflates the significance of the selection to participate in the Research Study with being selected as one of the OWS finalists. The source of Plaintiffs' confusion is the June 26 press release, issued two-and-a-half weeks after the Annual Meeting. As the Complaint alleges, Vaxart's press release raised concerns in the investment community and among regulators. In an article discussed in the Complaint, *The New York Times* cited Vaxart as an example of "companies . . . attracting government scrutiny for potentially using their associations with Operation Warp Speed as marketing ploys."[175] The article focused on the Company's June 26 press release, noting: "Vaxart's vaccine candidate was included in a trial on primates that a federal agency was organizing in conjunction with Operation Warp Speed. But Vaxart is not among the companies selected to receive significant financial support from Warp Speed to produce hundreds of millions of

---

[175] NYT Article.

vaccine doses."[176]   Indeed, the federal government went out of its way to knock down any misconceptions about Vaxart's involvement with OWS:

> "The U.S. Department of Health and Human Services has entered into funding agreements with certain vaccine manufacturers, and we are negotiating with others. Neither is the case with Vaxart," said Michael R. Caputo, the department's assistant secretary for public affairs. "Vaxart's vaccine candidate was selected to participate in preliminary U.S. government studies to determine potential areas for possible Operation Warp Speed partnership and support.  At this time, those studies are ongoing, and no determinations have been made."[177]

The Complaint contains nothing beyond conclusory allegations that Vaxart's OWS selection to participate in a preliminary non-human primate study, for which the Company is not alleged to have received any funds, would have been material to a stockholder voting on the Plan Amendment.

The allegations in the Complaint contrast sharply with the allegations of a federal securities suit in the United States District Court for the Northern District of California.  In that case, the plaintiffs allege that Vaxart and its officers "deliberately crafted a press release designed to make it seem as if the company had achieved something significant—a trough of federal funding through Warp Speed—when in fact it had accomplished nothing of the sort." *In re Vaxart, Inc. Sec. Litig.*, 2021 WL 6061518, at *7 (N.D. Cal. Dec. 22, 2021).  The claims in that case allege not that the

---

[176] *Id.*

[177] *Id.*

45

Company's selection to participate in the Research Study was material, but rather that the Company's press release announcing this fairly pedestrian event "created the materially misleading impression that Vaxart stood at the precipice of pioneering a successful coronavirus vaccine." *Id.* at *4.[178]

By contrast, Plaintiffs here have taken the opposite approach, alleging that Vaxart's invitation to participate in the Research Study was, in fact, material information. The Complaint lacks non-conclusory allegations that the invitation to participate in the Research Study, which was subject to further negotiation, was information that was material to a stockholder voting to increase the number of awards available under the Plan. There are no facts alleged to support the conclusory allegation that on or before June 8, 2020, the Director Defendants had "full knowledge of the inflationary effect the OWS selection would have on the value of

---

[178] A similar press release was at issue in *McDermid v. Inovio Pharmaceuticals, Inc.*, 520 F. Supp. 3d 652 (E.D. Pa. 2021). In that case, the plaintiffs asserted federal securities claims concerning a different pharmaceutical company's statements about its COVID-19 vaccine. Like Vaxart, the company at issue in that case (Inovio) issued a press release in late June 2020 with a headline stating that the company's vaccine had been "[s]elected for the U.S. Government's Operation Warp Speed." *Id.* at 659. But the full press release explained that the company had been chosen to participate in an OWS sponsored non-human primate study. *Id.* at 659–60. The plaintiffs alleged the press release was materially false and misleading. The court disagreed, observing the plaintiffs did not explain how or why a reasonable investor, reading the entire press release, "would have thought Inovio would receive government funding for its vaccine." *Id.* at 669. In the California federal securities action involving Vaxart, the court found *McDermid* unpersuasive, noting the different context and circumstances surrounding the claims in that case as compared to those presented in the complaint before the court. *Vaxart*, 2021 WL 6061518, at *6.

the Board's option grants."[179]  Nor are there facts to support the conclusion that on June 8, 2020 the Board "knew that public disclosure" of the Company's selection to participate in the non-human primate study "would lead to Vaxart's stock price skyrocketing."[180]

The Complaint acknowledges that stockholders were aware of Vaxart's publicly disclosed efforts to develop a COVID-19 vaccine, weeks, even months before the Annual Meeting.[181]  This included the April 2020 announcement that Vaxart's "COVID-19 vaccine candidates had produced promising results in preclinical, nonhuman trials."[182]  In light of these disclosures, the Complaint fails to allege facts to support a reasonable inference that an invitation to participate in a non-human primate study would have significantly altered the total mix of information available to Vaxart stockholders when deciding how to vote on the Plan Amendment.[183]  Accordingly, Count II is dismissed.

---

[179] Compl. ¶ 15.

[180] *Id.* ¶ 84.

[181] *See id.* ¶¶ 39, 41.

[182] *Id.* ¶ 41; *see* Vaxart, Inc., Current Report (Form 8-K) (Apr. 29, 2020), Ex. 99.1 (announcing that Vaxart's "lead vaccine candidates generated anti-SARS CoV-2 antibodies in all tested animals after the first dose").

[183] Although it is not necessary for this decision, the Complaint lacks well-pleaded allegations to support a reasonable inference that any member of the Board, other than Latour, was aware of the invitation to participate in the Research Study before the June 8, 2020 Board meeting.  Given that Vaxart was in the process of "negotiating the relevant documentation," it is reasonable to infer that Latour, as the Company's CEO, knew of the

47

## C. The Unjust Enrichment Claims

Count III is a derivative claim against Floroiu, Latour, Davis, Finney, Yedid, and VanLent for unjust enrichment. Plaintiffs maintain that the "Board members were unjustly enriched when they granted themselves 'spring-loaded' options after

Research Study selection before the Annual Meeting. Vaxart Defs.' Ex. 26 at 2. The Complaint, however, fails to support the reasonable inference that Latour shared this information with other Board members ahead of the Annual Meeting. "The only conceivable inference," Plaintiffs insist, "is that Latour was gleefully sharing the good news with the Board immediately after he was informed." Compl. ¶ 52. Even if the agreement had not yet been finalized, Plaintiffs allege, Latour would have "surely kept his fellow Board members apprised of the status of this make-or-break negotiation with the government." *Id.* ¶ 57. These allegations have no basis. For reasons already discussed, the Complaint fails to support the inference that the invitation to participate in the non-human primate study was a "make-or-break" development or that Latour would regard the study as having any such implications. If the Research Study selection had the momentous import that Plaintiffs allege, one would expect to see correspondence between Latour and the other directors on the subject. Pursuant to its Section 220 demand, Plaintiffs had the Company run relevant search terms—including "Operation Warp Speed," "OWS," and "BARDA." Vaxart Defs.' Ex. 28. Plaintiffs, however, cite no such correspondence in the Complaint. The allegation that the remaining directors must have been told about the Research Study invitation prior to the June 8, 2020 Board meeting amounts to "surmise, speculation, [and] conjecture." *In re Xura, Inc., S'holder Litig.*, 2018 WL 6498677, at *14 n.139 (Del. Ch. Dec. 10, 2018) (quoting *In re Asbestos Litig.*, 155 A.3d 1284, 1284 n.2 (Del. 2017) (TABLE); *see Pfeffer*, 965 A.2d at 687 ("The assertion that the Viacom Directors knew of the cash flow analysis because [the CEO] would have told [the Chairman of the Board] could not be more conclusory"); *In re Zimmer Biomet Holdings, Inc. Deriv. Litig.*, 2021 WL 3779155, at *21 (Del. Ch. Aug. 25, 2021) (rejecting as unreasonable the inference that two directors shared material non-public information with two shareholder funds that then allegedly traded on that information). In their supplemental briefing, Plaintiffs have introduced for the first time a fraud-on-the board theory against Latour. "This was not alleged in the Complaint, so I do not consider it an appropriate cause of action to be addressed here." *Galindo v. Stover*, 2022 WL 226848, at *4 n.59 (Del. Ch. Jan. 26, 2022); *see also Cal. Pub. Empl. Ret. Sys. v. Coulter*, 2002 WL 31888343, at *12 (Del. Ch. Dec. 18, 2002) ("Arguments in briefs do not serve to amend pleadings.").

48

deceiving stockholders into approving the 2020 Plan at a time when they knew that those options were worth far more than could be reasonably justified."[184]

Notably, the Complaint does not directly allege a claim for breach of fiduciary duty against the directors for issuing awards to themselves. Count I alleged a breach of fiduciary duty against the Director Defendants for approving the Warrant Amendments,[185] and Count II alleged a breach of fiduciary duty against the Director Defendants for failing to supplement the Proxy with information about the invitation to participate in the OWS Research Study.[186] The only claim challenging any compensation decision is Count III for unjust enrichment.[187]

Plaintiffs' decision to challenge the director compensation decisions solely under an unjust enrichment theory places this case in an unusual context. Stockholders challenging executive compensation decisions frequently challenge both the board or compensation committee's decision to grant the compensation as

---

[184] Pls.' Ans. Br. at 40. In their supplemental briefing, Plaintiffs have raised a different theory. That theory posits that "Latour, Davis, Finney, Yedid, and Floroiu were enriched because they received options covering shares that exceeded the limit in the unamended 2019 Plan." Pls.' Suppl. Ans. Br. at 18. This new theory fails because, as discussed above, the stockholder vote on the Plan Amendment to increase the number of shares eligible for issuance under the Plan was not uninformed.

[185] Compl. ¶¶ 164–72.

[186] *Id.* ¶¶ 173–77.

[187] By contrast, the Galjour complaint, which is not the operative complaint, alleges the Director Defendants breached their fiduciary duties "by issuing the spring-loaded equity awards and approving the other self-interested equity arrangements complained of herein." Galjour Compl. ¶ 78.

a breach of fiduciary duty and separately that the recipient was unjustly enriched. For example, in *Calma v. Templeton*, 2015 WL 1951930 (Del. Ch. Apr. 30, 2015), Chancellor Bouchard denied a motion to dismiss to claims challenging director compensation. The focus of the decision was the fiduciary duty claim. After having determined that the plaintiffs had stated a claim for breach of fiduciary duty, the Chancellor sustained the unjust enrichment claim rather summarily. *Id.* at *20 ("[B]ecause I concluded above that Count I states a claim for breach of fiduciary duty, I also conclude that it is reasonably conceivable that Plaintiff could recover under Count III [alleging unjust enrichment]."). Similarly, in *Knight v. Miller*, 2022 WL 1233370 (Del. Ch. Apr. 27, 2022), Vice Chancellor Glasscock denied a motion to dismiss claims alleging members of the compensation committee breached their fiduciary duties in awarding compensation to themselves and other directors. Acknowledging that a parallel claim for unjust enrichment as to the recipients of those awards was not strong, he denied the motion to dismiss it because the complaint alleged that the committee "set the other awards in the same wrongful manner" as it did in making awards to themselves. *Id.* at *13; *see also SDF Funding LLC v. Fry*, 2022 WL 1511594, at *18 (Del. Ch. May 13, 2022) (denying a motion to dismiss fiduciary duty and unjust enrichment claims challenging bonus awards and stock grants because the adequately pleaded fiduciary duty claim operated as a predicate for the unjust enrichment claims); *Garfield v. Allen*, 2022 WL 1641802, at

50

*53–54 (Del. Ch. May 24, 2022) (denying a motion to dismiss breach of contract, breach of fiduciary duty, and unjust enrichment claims arising from the approval, receipt, and failure to correct executive compensation payments, noting that "[a]ll of the claims arise from a common nucleus of operative fact."); *Espinoza v. Zuckerberg*, 124 A.3d 47, 66–67 (Del. Ch. 2015) (holding that a duplicative unjust enrichment claim logically survived summary judgment when its underlying claim for breach of fiduciary duty survived); *Pfeiffer v. Leedle*, 2013 WL 5988416, at *10 (Del. Ch. Nov. 8, 2013) (declining to dismiss unjust enrichment claims where the complaint adequately alleged breach of fiduciary duty claims challenging stock options awarded to an executive); *Weiss v. Swanson*, 948 A.2d 433, 449–50 (Del. Ch. 2008) (denying motion to dismiss fiduciary duty claims challenging spring-loaded options and concluding it was also reasonably conceivable that recipients of the spring-loaded options were unjustly enriched, even as to unexercised options); *Ryan v. Gifford*, 918 A.2d 341, 347, 361 (Del. Ch. 2007) (denying motion to dismiss fiduciary duty and unjust enrichment claims arising from the alleged approval and acceptance of backdated options in violation of the company's option plans); *In re Tyson Foods, Inc.*, 919 A.2d 563, 602–03 (Del. Ch. 2007) (finding that the fiduciary duty allegations, even if only proven as to some of the defendants, may serve as a basis for unjust enrichment claims as to others).

Unlike in the aforementioned cases, Plaintiffs have not asserted a separate claim alleging a breach of fiduciary duty for the awarding of director and officer compensation.

### 1.    The Plaintiffs' Claims

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[188] *Id.* at 1130. The "impoverishment" element does not "require that the plaintiff seeking a restitutionary remedy suffer an actual financial loss, as distinguished from being deprived of the benefit unjustifiably conferred upon the defendant." *Id.* at 1130 n.37.

By their nature, compensation awards from a company to its directors implicate the first three elements. The wrongdoing therefore turns on the fourth element, an "absence of justification." *See Feuer v. Redstone*, 2018 WL 1870074, at *17 (Del. Ch. Apr. 19, 2018) (finding plaintiff adequately pleaded that ongoing

---

[188] In a recent scholarly analysis of unjust enrichment, Vice Chancellor Laster highlights how the final element of the claim as cited in *Nemec* and other cases appears to have been the product of "jurisprudential missteps." *Garfield*, 2022 WL 1641802, at *44. An application of the fifth element is not necessary to resolve the pending motion.

compensation payments to an incapacitated executive "lacked justification"); *Fry*, 2022 WL 1511594, at \*18 (declining to dismiss unjust enrichment claims based on compensation decisions when "the absence of an arms-length negotiated transaction and the allegation that Defendants were knowingly complicit in a breach of fiduciary duties . . . support finding that justification was absent."); *see also Jacobs v. Meghji*, 2020 WL 5951410, at \*14 (Del. Ch. Oct. 8, 2020) (holding that to support a claim of unjust enrichment, "there must be an absence of justification for the defendant's benefit obtained through the challenged transaction" and "'[t]hat requirement usually entails some type of wrongdoing or mistake at the time of transfer.'"). Plaintiffs allege that Floroiu, Latour, Davis, Finney, Yedid, and VanLent were enriched without justification because they received stock options that were "spring-loaded."

Spring-loading refers to the practice of "issuing options just before a release of positive information" with the knowledge that "the company's stock is worth more than its market trading price because the market is ignorant of information that will affect the price." *Desimone v. Barrows*, 924 A.2d 908, 943–44 (Del. Ch. 2007); *see also* Securities & Exchange Commission, Staff Accounting Bulletin No. 120, 17 CFR Part 211 (Nov. 24, 2021), https://www.sec.gov/oca/staff-accounting-bulletin-120 (noting that a "share-based payment award granted when a company is in possession of material nonpublic information to which the market is likely to react

positively when the information is announced is sometimes referred to as being 'spring-loaded.'").

Specifically, Plaintiffs allege that Floroiu, Latour, Davis, Finney, Yedid, and VanLent received options or other favorable compensation decisions as to their options, "whose value they knew would be greatly inflated by the OWS announcement."[189] Thus, the claim turns on whether it is reasonably conceivable under the well-pleaded allegations of the Complaint that at the time of these compensation decisions the Board knew that the invitation to participate in the Research Study was material information. In other words, did the Director Defendants make the compensation decisions with knowledge of "material non-public information soon to be released that would impact the company's share price." *Tyson Foods*, 919 A.2d at 593.

An unjust enrichment claim may be rejected when the disputed enrichment is insufficiently related to the wrongful conduct at issue in the case. *See In re Nanthealth, Inc. S'holder Litig.*, 2020 WL 211065, at *8 (Del. Ch. Jan. 14, 2020) ("Here, the conduct underlying the fiduciary duty claim—allegedly making false and misleading disclosures—is unrelated to the directors' receipt of compensation from the Company. Thus, [the plaintiff] has failed to plead the necessary relationship

---

[189] Compl. ¶ 179.

between the conduct at issue and the alleged harm to the Company to support a claim for unjust enrichment."); *Bakotic v. Bako Pathology LP*, 2018 WL 6601172, at *5 (Del. Super. Ct. Dec. 10, 2018) ("The compensation that has allegedly unjustly enriched Plaintiffs was given to them as consideration under the Merger Agreement. Plaintiffs' alleged misconduct occurred well after the sale of the businesses, which was governed by the Merger Agreement, and is unrelated to this sum of money.").

### 2. Is Demand Excused?

The Plaintiffs' unjust enrichment claims are derivative.[190]  To survive the motion to dismiss, the Complaint must plead particularized facts to establish that demand is futile.  *Patel v. Duncan*, 2021 WL 4482157, at *17 (Del. Ch. Sept. 30, 2021); *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *28 (Del. Ch. Jan. 27, 2021).

Section 141(a) of the Delaware General Corporation Law provides that a corporation "shall be managed by or under the direction" of its board of directors.  8 *Del. C.* § 141(a).  This managerial authority encompasses the ability to determine whether to "initiate, or refrain from entering, litigation."  *Zapata Corp. v.*

---

[190] "A claim for unjust enrichment can be personal, direct, or derivative, depending on the facts alleged." *Bamford v. Penfold, L.P.*, 2020 WL 967942, at *32 n.25 (Del. Ch. Feb. 28, 2020) (citation omitted).  Where the "allegations focus on self-dealing payments that [the defendant] caused [the company] to make . . . the claim is exclusively derivative." *Id.* (citing *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1260–65 (Del. 2016)).

*Maldonado*, 430 A.2d 779, 782 (Del. 1981). Through derivative litigation, a stockholder may attempt to assert a claim on behalf of a corporation. To do so without the board of director's consent, the stockholder must demonstrate that "the stockholder demanded that the directors pursue the corporate claim and they wrongfully refused to do so," or that "demand is excused because the directors are incapable of making an impartial decision regarding the litigation." *United Food & Commercial Workers Union v. Zuckerberg*, 250 A.3d 862, 876 (Del. Ch. 2020), *aff'd*, 262 A.3d 1034 (Del. 2021).

Plaintiffs have not made any demand on Vaxart's Board to institute litigation against the Director Defendants. Therefore, Court of Chancery Rule 23.1 requires Plaintiff to "plead with particularity facts showing that a demand on the board would have been futile." *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009) (citing Ct. Ch. R. 23.1(a)). "To determine whether a board of directors could properly consider a demand, a court counts heads. If the board lacks a majority of directors who could exercise independent and disinterested judgment regarding a demand, then demand is futile." *Zuckerberg*, 250 A.3d at 877 (internal citations omitted). The standard for demand futility is "well balanced, requiring that the plaintiff plead facts with particularity, but also requiring that this Court draw all reasonable inferences in the plaintiff's favor." *Marchand v. Barnhill*, 212 A.3d 805,

56

818 (Del. 2019) (citation omitted).  Under *Zuckerberg*, the court considers on a director-by-director basis:

> (i)    whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand,
>
> (ii)    whether the director would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand, and
> (iii)    whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that is the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

*Zuckerberg*, 250 A.3d at 890 (formatting).

At the time of the Complaint, the Board consisted of Finney, Davis, Yedid, Floroiu, Latour, Boyd, Maher, and non-party Wilson (the "Demand Board").  Thus, to establish demand futility, the Complaint must plead particularized allegations to show that at least four of the members of the Demand Board could not consider a demand.  Plaintiffs concede that Wilson was capable of considering a demand.  Boyd and Maher did not receive any options and were not the beneficiaries of any of the compensation decisions challenged in this action.  Plaintiffs have tried to frame the compensation claims and the previously dismissed Warrant Amendment claims as a unitary transaction, rendering all of the directors, except Wilson, as interested and unable to consider a demand.  The court has already rejected that theory.  *In re Vaxart, Inc. S'holder Litig.*, 2021 WL 5858696, at *19–20 (Del. Ch. Nov. 30, 2021).

57

Thus, Boyd and Maher were not interested in the compensation decisions and were capable of considering a demand as to Count III. Therefore, to excuse demand, Plaintiffs must allege that four of the remaining five directors could not consider a demand. *United Food & Commercial Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021) ("demand is excused as futile" if "the answer to any of the questions is 'yes' for *at least half* of the members of the demand board") (emphasis added).

The unjust enrichment claim is grounded on the assertion that the Board approved stock options or engaged in other director compensation decisions with knowledge of the Company's invitation to participate in the Research Study and that they knew when making those decisions, that disclosure of the Research Study invitation would cause the value of their equity-based compensation to dramatically increase in value.

The demand futility analysis "proceeds director-by-director and transaction-by-transaction." *See Khanna v. McMinn*, 2006 WL 1388744, at *14 (Del. Ch. May 9, 2006). There are essentially four separate compensation decisions encompassed within the unjust enrichment claim: (1) the March Awards; (2) the April Awards; (3) the June 8, 2020 compensation decisions; and (4) the June 13, 2020 compensation decisions. Plaintiffs argue that in considering demand futility all of these decisions should be considered one decision, based on an alleged scheme.

58

### a. The March and April Awards

The March Awards and the April Awards—even if considered together—affected only two directors. Latour received an option to purchase 900,000 shares and Floroiu received an option to purchase 54,720 shares. None of the other directors is alleged to have received any of the March Awards or April Awards.

Six of the eight members of the Demand Board received no personal benefit from the March Awards and April Awards. The are no well-pleaded allegations that these six directors face a substantial likelihood of liability as to those grants. Nor are there any particularized allegations creating a reasonable inference that any of Davis, Finney, Yedid, Boyd, Maher, or Wilson lacks independence from Floroiu or Latour.

Plaintiffs argue demand is excused because all of the challenged compensation decisions are one interconnected decision arising from the Board's failure to disclose the Company's selection to participate in the Research Study before the Annual Meeting. The March Awards and the April Awards, however, predated the public announcement of OWS's creation. Plaintiffs seek to avoid this fact with the argument that the March Awards and the April awards were not granted until June 8, 2020 following the stockholder vote on the Plan Amendment. That assertion is incorrect. First, the Plan itself states that a grant of any award "will be deemed completed as of the date of such corporate action, . . . regardless of when

59

the . . . Award is . . . actually received or accepted by, the Participant."[191]  Second, as a matter of well-established Delaware law, as "to claims challenging stock options and other equity-based awards, this court has held that the relevant date is the grant date, not the time when the participant receives the shares."  *Garfield*, 2022 WL 1641802, at *13.  Demand is not excused as to the March Awards and the April Awards.  In addition, the Complaint fails to state a claim for unjust enrichment as to those awards because stockholders were not asked to vote on them and because, as discussed in the analysis of Count II, the stockholder vote on the Plan Amendment was not uninformed.  *See Knight*, 2022 WL 1233370, at *7 (dismissing duty of disclosure claim challenging equity awards where the proxy statement did not request that stockholders vote on or ratify those awards).[192]

---

[191] Plan § 8(b).

[192] Defendants argue that lead plaintiffs, Cynthia Jaquith and Paul Bergeron, lack standing to challenge these awards because they each purchased their Vaxart stock after they were granted.  *See* Vaxart Defs.' Ex. 30 (showing that Bergeron and Jaquith purchased Vaxart stock on April 29, 2020 and April 27, 2020, respectively); *see* 8 *Del. C.* § 327 ("In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation *at the time of the transaction of which such stockholder complains* or that such stockholder's stock thereafter devolved upon such stockholder by operation of law.") (emphasis added).  Defendants also argue that plaintiff Galjour forfeited his ability to allege demand futility because he later served a derivative demand on October 24, 2021.  Vaxart Defs.' Ex. 37, 38.  Because the court dismisses the unjust enrichment claim as to those awards on the merits and for failure to plead demand futility, the court does not reach the standing argument.

Following stockholder approval of the Plan Amendment on June 8, 2020, the Board awarded 65,000 stock options to each of Yedid, Davis, and Finney.  In addition to these outside-director awards, the Board also approved the accelerated vesting of VanLent's remaining options and the extension of their exercise period.[193] The Complaint does not allege anything about VanLent's options—*i.e.*, the exercise price, total number, or expiration dates.  The Complaint also inaccurately characterizes the Board's action on June 8, 2020 as to VanLent.  The Complaint alleges the Board "determined to reward VanLent . . . with *new* options."[194]  The Complaint cites to the June 8, 2020 Compensation Committee and Board minutes for this proposition.  Both of those documents, however, state that the committee recommended and the Board approved accelerated vesting and extension of the expiration date to June 8, 2022.[195]  Furthermore, the Compensation Committee's presentation to the Board explained that the departure package proposed and ultimately approved for VanLent mirrored the acceleration and vesting terms

---

[193] Vaxart Defs.' Ex. 25 at VAXART000013.

[194] Compl. ¶ 91 (emphasis added).

[195] The Plan authorizes the Board to amend the terms of any award.  Plan § 2(b).

provided to the last two directors who had stepped down from the Company's Board.[196]

Five of the eight members of the Demand Board received no benefit from the June 8, 2020 compensation decisions of the Board. Only three members of the Demand Board received option grants on June 8, 2020.

### c. The June 13, 2020 Compensation Decisions

On June 14, 2020, Latour resigned from the Board. According to a June 13, 2020 unanimous written consent of the Board (expressly referenced in the Complaint), the Company reached an agreement to terminate Latour as an officer but retain him as a member of the Board (the "June 13 Consent").[197] In the separation agreement approved by the Board, Latour's existing options would continue to vest for so long as he remained a director. The Complaint characterizes this as "gift[ing] Latour spring-loaded options."[198] The Complaint does not allege the number, terms, or exercise prices of the options affected by the separation agreement, but presumably it included all of the 900,000 options granted to Latour in the March Awards.

---

[196] Vaxart Defs.' Ex. 25 at VAXART000012; *see also* Vaxart Defs.' Ex. 21 (Latour and Davis looking to past practice to determine the appropriate package to be offered to VanLent as a departing director).

[197] Compl. ¶¶ 101–02; Vaxart Defs.' Ex. 27.

[198] Compl. ¶ 102.

The June 13 Consent also approved an award to Floroiu of 845,280 time-based options and 900,000 performance-based options in connection with his selection as Latour's replacement as CEO. The award was effective June 15, 2020. The exercise price of the options was the closing stock price on the date of grant, which was $2.46. As noted earlier, one-third of the performance-based options would vest if the Company's closing stock price remained above $5 per share for ten consecutive trading days before November 30, 2020. Each of the remaining two thirds would similarly vest if the stock price closed above $7.50 and $10 per share, respectively, during the same time period. As alleged in the Complaint, all of the performance-based options vested in late July 2020.

Only two of the eight members of the Demand Board received any financial benefit from the June 13, 2020 compensation decisions. As with the March Awards and the April Awards, there are no particularized allegations creating a reasonable inference that any of Davis, Finney, Yedid, Boyd, Maher, or Wilson lacked independence from Floroiu or Latour.

### d. The Collective Action Argument

Plaintiffs do not allege or argue that, if the challenged compensation decisions are viewed separately, demand is excused. Instead, Plaintiffs argue that the compensation decisions should be viewed as one transaction for purposes of the

63

demand analysis.[199] Plaintiffs contend that the Delaware Supreme Court's decision in *In re Investors Bancorp, Inc. Stockholder Litig.*, 177 A.3d 1208 (Del. 2017), *as revised* (Dec. 19, 2017) compels that result.

In *Investors Bancorp*, stockholders asserted claims challenging equity awards to directors and officers alleged to be excessive and far beyond that of peer companies. The board issued the awards pursuant to an equity incentive plan giving the board discretion to issue awards. In an opinion reversing this court's dismissal of the complaint, the Delaware Supreme Court held that stockholder approval of the plan did not justify a ratification defense because the stockholders did not ratify the specific awards that were being challenged. The Court then addressed the question of whether demand was excused as to awards made to two executive directors. The outside directors argued that they were not disabled for considering a demand as to those awards because the plaintiffs had not demonstrated a *quid pro quo* between the executive director awards and the outside director awards. The Court disagreed, explaining that alleging a *quid pro quo* was not necessary to excuse demand. "Although showing a *quid pro quo* might be one way of proving interestedness or

---

[199] The Plaintiffs actually contend that all of the challenged actions in this case should be viewed collectively from a demand perspective, not only the June 2020 compensation decisions, but also the decision to amend the Warrant Agreements and the March Awards and the April Awards. The court already rejected that argument as to the Warrant Amendments. *See In re Vaxart, Inc. Stockholder Litig.*, 2021 WL 5858696, at *19 (Del. Ch. Nov. 30, 2021).

lack of independence, it is not a requirement. Rather, the focus is on the acts being challenged and the relationship between those acts and the directors who approved them." *Id.* at 1225. In that case, the Investors Bancorp directors held a series of nearly contemporaneous meetings to consider extraordinary awards to directors and officers immediately after stockholders had approved a new equity incentive plan. In fact, the awards were all granted on the same day. *Id.* at 1215 (noting that the board approved the incentive stock and option grants on June 23, 2015). In addition, the nature of the compensation decisions at issue all involved extraordinary grants of options. Based on those circumstances, the Court concluded that it would be "implausible" for non-employee directors to independently consider a demand that would call into question the grants they made to themselves. *Id.* at 1226.

The circumstances of *Investors Bancorp* do not neatly fit the facts of this case. The Vaxart Board's compensation decisions occurred on different days, and not all of them involved direct awards of stock or options. The June 8, 2020 option awards to Finney, Davis, and Yedid were annual outside-director awards and their timing was not unusual. The decision that same day to accelerate and extend by two years the expiration of VanLent's options is not unusually suspicious from a timing standpoint. Indeed, Plaintiffs do not challenge those decisions for any reason other than the Company's failure to disclose the invitation to participate in the Research Study before making the grants. The two compensation decisions that occurred on

65

June 13, 2020 were tied to a change in the CEO, and one of them did not involve an award of equity compensation. Those distinctions support Defendants' argument that the compensation decisions at issue here should not be viewed as a unitary act for purposes of assessing demand futility.

On the other hand, the sole basis for Plaintiffs' unjust enrichment claim is that the Board made these decisions knowing that the beneficiaries would soon handsomely profit once the invitation to participate in the Research Study was disclosed. Viewed in that light, four of the eight members of the Demand Board (Yedid, Davis, Finney, and Floroiu) would be required to consider a demand that would "call into question the grants they made to themselves" based on their alleged knowledge of the Research Study invitation and its significance at the time of the grants. *Investors Bancorp*, 177 A.3d at 1226. Given the "relationship between [the] acts [challenged] and the directors who approved them," the court considers demand as to the June 2020 compensation decisions as a single transaction, for which a majority of the Demand Board is not disinterested. *Id.* at 1225.

"Materiality is a case-specific endeavor." *Kihm v. Mott*, 2021 WL 3883875, at *22 (Del. Ch. Aug. 31, 2021), *aff'd*, 2022 WL 1054970 (Del. Apr. 8, 2022). "Materiality is intrinsically a contextual concept that requires consideration of the nature of the supposedly material information that was not public knowledge and of the other information that was known to the market." *In re Oracle Corp.*, 867 A.2d

66

904, 934 (Del. Ch. 2004), *aff'd sub nom. In re Oracle Corp. Deriv. Litig.*, 872 A.2d 960 (Del. 2005); *see also Galindo v. Stover*, 2022 WL 226848, at *7 (Del. Ch. Jan. 26, 2022) ("Delaware cases have further recognized that materiality is, by its nature, a contextual and fact-specific concept, requiring careful consideration of the allegedly material nonpublic information in conjunction with the public knowledge of the market.").

The unjust enrichment claim is premised solely on the allegation that the directors made the June compensation decisions with knowledge that the invitation to participate in the Research Study was information that, once in the market, would cause the stock price to increase and, in turn, make their options more valuable. Therefore, according to Plaintiffs, the Board should have deferred their compensation decisions until after announcing the invitation to participate in the Research Study.

The operative inquiry for the court is determining when the Board learned of the allegedly material information "and understood its significance to [the company's] financial performance." *In re TrueCar, Inc. S'holder Deriv. Litig.*, 2020 WL 5816761, at *14 (Del. Ch. Sept. 30, 2020). The well-pleaded allegations of the Complaint support a reasonable inference that at the time the June 2020 compensation decisions were made, the Company had been invited to participate in a non-human, primate study supported by OWS. The terms were still being

67

negotiated, no funds were attached, and the invitation did not offer fast-tracking of Vaxart's oral COVID-19 vaccine. The Company had already conducted and reported on animal studies. None of the Complaint's well-pleaded allegations support a reasonable inference that the directors understood at the time they made the June 2020 compensation decisions that the invitation to participate in the Research Study would be significant to the Company's financial performance.

Plaintiffs point to the jump in Vaxart's stock price after the June 26, 2020 announcement as evidence of materiality, but they fail to substantiate that assertion with any well-pleaded facts. As in *Desimone*, Vaxart's stock price was volatile, a fact that the Company itself had acknowledged.[200] The increase in Vaxart's stock price in late June 2020 followed three consecutive days of press releases, including the inclusion of Vaxart's stock on the Russell 3000 Index. Plaintiffs acknowledge that "the Company's stock price would potentially rise upon being listed on the Russell 3000."[201] But just days after the June 26 press release, the stock closed near pre-announcement levels. The Department of Health and Human Services also went out of its way in July 2020 to knock down any misconception that Vaxart was in line

---

[200] *See* Vaxart, Inc., Form 10-K (Feb. 6, 2019) at 42 (noting that the Company's stock price was "expected to be volatile," had been "subject to significant fluctuations," and that market prices for "securities of early-stage pharmaceutical, biotechnology and other life sciences companies have historically been particularly volatile."); Vaxart, Inc., Form 10-K (Mar. 19, 2020) at 42 (same).

[201] Compl. ¶ 151.

to receive government funding for its vaccine. As the Court in the federal securities action acknowledged, the focus of any wrongdoing on the part of Vaxart or its officers and directors is in how they portrayed the Company's participation in the Research Study, not the invitation itself. *Vaxart*, 2021 WL 6061518, at *5-6.

As with the claim challenging the vote on the Plan Amendment, Plaintiffs' assertion that the invitation to participate in the Research Study was material information conflates that event with being selected as one of the finalists to receive government funding to develop and produce a COVID-19 vaccine. There are no well-pleaded allegations in the Complaint creating a reasonable inference that an invitation to participate in the Research Study, which was subject to further negotiation, was material non-public information on June 8, 2020, when the Board approved the annual director grants to Yedid, Davis, and Finney and accelerated and extended the expiration dates of VanLent's options. *See Investors Bancorp*, 177 A.3d at 1223 (indicating that equitable review of director self-compensation decisions focuses on the directors' conduct "when making the awards"); *see also Weiss*, 948 A.2d at 452–53 (sustaining fiduciary duty and unjust enrichment claims where the board had a policy of issuing spring-loaded and bullet-dodging options where the directors knew the contents of the yet-to-be-issued quarterly earnings release). Therefore, the Complaint fails to allege that the Board knowingly granted spring-loaded options to Yedid, Davis, and Finney on June 8, 2020. The Complaint

also fails to allege that the Board accelerated and extended the expiration dates of VanLent's options on June 8, 2020 knowing that the invitation to participate in the Research Study was material non-public information.

The invitation to participate in the Research Study is nothing close to the allegedly undisclosed material information that resulted in denial of motions to dismiss in other compensation cases. For example, in *Knight*, stockholders alleged directors granted equity awards to the board of a healthcare company at a strike price set on the same day the company's stock had hit its lowest price during the pandemic, and at a time when the chairman and controlling stockholder "'knew or had reason to know of the time and extent of federal grants,' including relief that [the company] might reasonably expect to receive." 2022 WL 1233370 at *10. In *Howland v. Kumar*, the court denied a motion to dismiss claims challenging the repricing of options where the board knew that the federal government had approved one of its patents, and provided the expected issuance date, but did not announce the patent decision until after the repricing. 2019 WL 2479738, at *1, *6. Notably, the court dismissed claims as to one director who was not alleged to have known of the patent issuance at the time of the repricing. *Id.* at *5. In *Weiss*, the defendant directors were given early access to the company's quarterly earnings releases, containing information that materially affected the company's stock price, and the plaintiff alleged that the directors repeatedly used that information to time their own option

awards under the company's equity incentive plan. 948 A.2d at 439. In *Tyson*, the plaintiff alleged that the compensation committee would award options to key employees days before the company would issue press releases that were very likely to drive stock prices higher. 919 A.2d at 576. Unlike in *Weiss* and *Tyson*, Plaintiffs here do not allege an extended practice of awarding spring-loaded, bullet-dodging, or back-dated options.[202]

\* \* \*

The challenge to the compensation decisions made in connection with the CEO transition also fails to state a claim. Those decisions are reflected in the June 13, 2020 unanimous written consent of the directors. As to Latour, the Plaintiffs do not articulate how the decision to permit his options to continue to vest involved spring-loading, at least not in the classic sense of the term. Latour's most recent

---

[202] At the time the Board met on June 8, 2020 to consider the awards to Yedid, Davis, and Finney, the Compensation Committee had already recommended those annual outside-director grants based on an analysis by its compensation consultant. The number of options proposed for each outside director was based on a percentage of the total number of outstanding shares. The Complaint does not challenge the number of options awarded to these directors. The Plan provides that the maximum amount of compensation to any outside director in a calendar year cannot exceed $600,000. Plan § 3(d). Plaintiffs do not allege the compensation paid to Yedid, Davis, or Finney in 2020, including the June 8, 2020 awards exceeded that amount. Defendants have not relied on this provision in support of their motion to dismiss. The court in *3COM* held that discretionary awards within specific ceilings based upon specific categories of service would be subject to the business judgment standard of review. 1999 WL 1009210, at *2–3. The Delaware Supreme Court's decision in *Investors Bancorp*, however, suggests that even grants within such limitations cannot escape judicial review "when a breach of fiduciary duty claim has been properly alleged." *Investors Bancorp*, 177 A.3d at 1222.

option award occurred in March 2020. The June 2020 decision did not involve a grant of new options or change in the exercise price. Instead, the Board allowed his existing options to continue vesting as long as he remained on the Board as part of the termination agreement between Latour and the Company, which was permitted under the terms of the Plan. The second decision awarded time-based and performance-based options to Floriou as part of his compensation package as the new CEO. As with the June 8, 2020 compensation decisions, there are no well-pleaded allegations that the Board knowingly spring-loaded Floriou's options based on the invitation to participate in the Research Study. Nor does the Complaint allege that the Board amended Latour's options knowing that the invitation to participate in the Research Study was material information.

Although materiality is generally considered an issue of fact, dismissal here is appropriate because it is "so obvious[] . . . that reasonable minds cannot differ on the question" of whether the invitation to participate in the Research Study was material at the time of the June 2020 compensation decisions. *In re Tele-Commc'ns, Inc. S'holders Litig.*, 2005 WL 3642727, at *3 (Del. Ch. Dec. 21, 2005). It was not. The terms were still being negotiated. There are no well-pleaded allegations that selection for participation in the Research Study was a watershed moment as Plaintiffs assert. Plaintiffs must accept the "crucial reality that Vaxart had been

72

chosen only to participate in a primate study and not to receive a vast influx of federal funds."[203]

Count III is dismissed for failure to state a claim as to all of the challenged compensation decisions and for failure to plead demand futility as to the March Awards and the April Awards.[204]

## IV. CONCLUSION

The motions to dismiss Count II and Count III are granted in their entirety. This conclusion is based on the allegations of the Complaint and how the Plaintiffs have framed their claims. The Plaintiffs have not alleged that the Director Defendants breached their fiduciary duties or were unjustly enriched based on a plan to exaggerate the significance of the Company's selection to participate in the Research Study and then to capitalize on the selling or vesting of options at inflated market prices. That is not the Plaintiffs' theory. The Plaintiffs chose to ride with the claims asserted in the operative complaint instead of filing a consolidated complaint. The claims, as pleaded in the Complaint, do not state a claim that the stockholder vote on the Plan Amendment was uninformed or the product of a breach

---

[203] *Vaxart*, 2021 WL 6061518, at *5.

[204] Therefore, the court need not reach the merits of the Director Defendants' other defenses to this claim.

73

of the duty of disclosure or that Latour, Floroiu, Davis, Finney, Yedid, or VanLent was unjustly enriched.

**IT IS SO ORDERED.**